Meyer v. State.

---

ROBERT T. MEYER v. STATE OF NEBRASKA.

FILED FEBRUARY 16, 1922. No. 21924.

1. **Schools and School Districts:** FOREIGN LANGUAGE LAW: POLICE POWER. The statute (Laws 1919, ch. 249) prohibiting the teaching of foreign languages in schools to children before they have passed the eighth grade, *held,* a reasonable exercise of the police power of the state.

Meyer v. State.

2. ———: ———: Legislative Powers. It is within the power of the legislature to say that the education of children in the primary grades shall not be conducted in a foreign language, and to go farther and prevent the teaching of a foreign language to children in the schools until they have become thoroughly grounded in English.

3. Constitutional Law: Religious Liberty: Public Welfare. Though every individual is at liberty to adopt and to follow, with entire freedom, whatsoever religious beliefs appeal to him, that does not mean that he will be protected in every act he does which is consistent with those beliefs, for when his acts become inimical to the public welfare of the state the law may probihit them, though they are acts done in pursuance of and in conformity with the religious scruples of that individual.

4. ———: ———: Foreign Language Law. Though the statute prohibits the teaching of a foreign language in a parochial school, even when that language is to be used later in religious worship, held, that such restriction does not unlawfully interfere with the right of religious freedom in the school, or the incidental right to freely give religious instruction as guaranteed by the Constitution.

5. Schools and School Districts: Foreign Language Law: Violation: Parochial Schools. When, in a parochial school, a foreign language is taught from a book containing a religious text, the fact that the study of the language is mingled with the study of a religious subject does not afford the teacher protection as against the penalty imposed by the statute for the teaching of such language.

6. Information: Sufficiency. When the offense is a statutory one and the statute sets forth what elements shall constitute the crime, it is sufficient in the information to describe the crime in the language of the statute.

7. Schools and School Districts: Foreign Language Law: Application. The statute prohibiting the teaching of foreign languages in the schools was intended to prohibit the teaching of such language whenever the pupils of the school should be assembled for the purpose of receiving instruction, and was not limited, in its aim, to those school hours only which should be set aside to the teaching of the common school branches.

8. Evidence examined, and held sufficient to support the verdict.

Error to the district court for Hamilton county: Edward E. Good, Judge. Affirmed.

*Sandall & Wray* and *Albert & Wagner,* for plaintiff in error.

*Clarence A. Davis, Attorney General,* and *Mason Wheeler, contra.*

Heard before MORRISSEY, C. J., ALDRICH, DAY, DEAN, FLANSBURG and LETTON, JJ.

FLANSBURG, J.

In this action the defendant Meyer was charged with the violation of chapter 249, Laws 1919, commonly known as the Siman language law. He was found guilty and fined $25. From such judgment he has appealed to this court.

The law in question provides that no person, individual or as a teacher shall, in any private, denominational, parochial or public school, teach any subject to any person in any language other than the English language, and provides that languages, other than the English language, shall not be taught in such schools until after the pupil has attained and successfully passed the eighth grade.

The evidence shows that the defendant was a teacher in a parochial school maintained by the Zion Evangelical Lutheran Congregation, and that between the hour of 1 and 1:30, on May 25, 1920, he taught the German language in this school to a 10-year-old boy, a pupil in the school, who had not passed the eighth grade. The text book used for such teaching was a book of biblical stories, written in the German language. The defendant argues that in teaching the German language in this book he was giving religious instruction according to the faith of the Zion Evangelical Lutheran Congregation. In regard to the purpose of the teaching, the pastor of the church testified:

"We have some members who had emigrated to this country when they were beyond school age and have not attended school over here, and they have learned enough to carry on their business transactions by means of the

English language, but still they have had their instruction in religion in the German language and cannot understand an English sermon as well as in German, and they cannot give their children religious instruction in the English as well as in the German; and in order to keep the parents and children in a religious way in contact with each other and not diminish the influence of the parents in the home—for instance, so that the children can take part in the devotional exercises of the parents at home, attend public worship with the parents and worship with them—for that reason we wanted to have the children learn so much German that they could be able to worship with their parents. That was the ultimate and only object we had in view in teaching German."

From this testimony it is clear that the reading from the text book was not, at least solely, a devotional exercise. It was not religious worship, nor was it, primarily, religious instruction in itself. The text book contained biblical stories, but the subject-matter of the text, used for the purpose of studying a language, does not alone control nor indicate the object of the study. The object was, as stated, "to have the children learn so much German that they could be able to worship with their parents."

Defendant argues, then, that the teaching of the German language from this book containing Bible stories served a double purpose, in that it both taught the children the German language and also familiarized them with the Bible stories, and that the teaching, so characterized, was religious instruction. It must be conceded, even under that argument, that two subjects were being taught—one the German language and one a religious text. If the law prohibited the teaching of the German language as a separate and distinct subject, then, certainly, the fact that such language was taught from a book containing religious matter could not act as a shield to the defendant. The teaching of the German

language, as a subject, would come within the direct prohibition of the law, regardless of what text might be used in the book from which the language was taught. It does not appear that the German language is a part of the religion of this church, nor that the services must, according to that particular faith, be rendered in German. It is true that in familiarizing the children with the German language they would become better able to fully understand the services of the church when conducted in German, but, so far as teaching the particular religious beliefs of the church to the children in the school was concerned, such religious teaching could, manifestly, be as fully and adequately done in the English as in the German language.

At this time we are not concerned, then, with the question of whether or not defendant had the right to conduct devotional exercises in the German language. Had that been the sole manner in which the German language was being used, it would have presented an entirely different question. It is not here a question as to the right to hold devotional exercises in the German language, regardless of what the pupils might incidentally attain in learning and familiarity with that language while in attendance upon such exercises, but it is a question of the direct and intentional teaching of the German language as a distinct subject.

The whole question resolves itself to this: Does the statute interfere with the right of religious freedom, by prohibiting the teaching of a foreign language, when that language is taught with the idea and purpose of later using it, at some other time or place or in the school itself, in religious worship?

The salutary purpose of the statute is clear. The legislature had seen the baneful effects of permitting foreigners, who had taken residence in this country, to rear and educate their children in the language of their native land. The result of that condition was found to be inimical to our own safety. To allow the children of

foreigners, who had emigrated here, to be taught from early childhood the language of the country of their parents was to rear them with that language as their mother tongue. It was to educate them so that they must always think in that language, and, as a consequence, naturally inculcate in them the ideas and sentiments foreign to the best interests of this country. The statute, therefore, was intended not only to require that the education of all children be conducted in the English language, but that, until they had grown into that language and until it had become a part of them, they should not in the schools be taught any other language. The obvious purpose of this statute was that the English language should be and become the mother tongue of all children reared in this state. The enactment of such a statute comes reasonably within the police power of the state. *Pohl v. State,* 102 Ohio St. 474; *State v. Bartels,* 191 Ia. 1060.

It is suggested that the law is an unwarranted restriction, in that it applies to all citizens of the state and arbitrarily interferes with the rights of citizens who are not of foreign ancestry, and prevents them, without reason, from having their children taught foreign languages in school. That argument is not well taken, for it assumes that every citizen finds himself restrained by the statute. The hours which a child is able to devote to study in the confinement of school are limited. It must have ample time for exercise or play. Its daily capacity for learning is comparatively small. A selection of subjects for its education, therefore, from among the many that might be taught, is obviously necessary. The legislature no doubt had in mind the practical operation of the law. The law affects few citizens, except those of foreign lineage. Other citizens, in their selection of studies, except perhaps in rare instances, have never deemed it of importance to teach their children foreign languages before such children have reached the eighth grade. In the legislative mind, the salutary

effects of the statute no doubt outweighed the restriction upon the citizen generally, which, it appears, was a restriction of no real consequence.

Whether or not the policy of this law is correct is not for the court to say. That was a question exclusively for the legislature. The question for the court is whether the law is reasonable, and not capricious and arbitrary; whether it was enacted in the interests of the welfare of the state; whether it is a lawful exercise of the police power; in general, whether it is constitutional. If the policy of the law is wrong, the people of the state, through the legislature, or upon their own initiative, can change it.

A thorough knowledge of the German language as would be gained by young children by a course of study in the schools would no doubt, as pointed out in the testimony, make more convenient the matter of religious worship with their parents, whose knowledge of English was limited; but is such a reason sufficient to override the salutary effect and purpose of the statute? If a foreign language can be taught to children of tender years, for the purpose of allowing them to worship in that language, under the guise that such instruction is religious teaching, then the statute is a nullity. Writing, reading, geography, and a variety of other subjects, could as well be called religious subjects whenever the purpose was declared to be to use the knowledge, thus attained, as an aid in religious worship.

Though the statute prohibits the study of the German language and may, to an extent, limit the younger children from as freely engaging in religious services, conducted in the German language, as otherwise might be the case, we cannot say that such restriction is unwarranted. The law in no way attempts to restrict religious teachings, nor to mold beliefs, nor interfere with the entire freedom of religious worship.

Whenever the actions of individuals, even though in pursuance of religious beliefs—in this case the teaching

in the schools of the German language to children of tender years—are considered as not in harmony with the public welfare, then it is proper that those acts be curbed.

As said by Chief Justice Campbell in *In re Frazee,* 63 Mich. 396, 405: "We cannot accede to the suggestion that religious liberty includes the right to introduce and carry out every scheme or purpose which persons see fit to claim as part of their religious system. There is no legal authority to constrain belief, but no one can lawfully stretch his own liberty of action so as to interfere with that of his neighbors, or violate peace and good order. The whole criminal law might be practically superseded if, under pretext of liberty of conscience, the commission of crime is made a religious dogma. It is a fundamental condition of all liberty, and necessary to civil society, that all men must exercise their rights in harmony, and must yield to such restrictions as are necessary to produce that result."

Though every individual is at liberty to adopt and follow with entire freedom whatsoever religious beliefs appeal to him, that does not mean that he will be protected in every act which he does which is consistent with those beliefs, for when his acts either disturb the public peace, or corrupt the public morals, or otherwise become inimical to the public welfare of the state, the law may prohibit them, though they are done in pursuance of and in conformity with the religious scruples of the offending individual. 12 C. J. 944, sec. 453; *McDowell v. Board of Education,* 172 N. Y. Supp. 590; *State v. Neitzel,* 69 Wash. 567, 43 L. R. A. n. s. 203; *Reynolds v. United States,* 98 U. S. 145; *People v. Ashley,* 172 N. Y. Supp. 282; *Smith v. People,* 51 Colo. 270, 36 L. R. A. n. s. 158; *Owens v. State,* 6 Okla. Cr. Rep. 110.

The statute, therefore, which prohibits the teaching of the German language in a parochial school, does not unlawfully interfere with the right of religious freedom in

Meyer v. State.

the school, or the incidental right to freely give religious instruction, as guaranteed by the Constitution.

It is urged that the information does not sufficiently charge an offense under the statute. The information is framed in the language of the statute, but it does not set out that the teaching complained of was during regular school hours, nor that the school in which the teaching was done was a school which presented a course of study such as that prescribed by the compulsory education act. The contention that these allegations were necessary is based upon the interpretation of the statute by the holding in *Nebraska District of Evangelical Lutheran Synod v. McKelvie*, 104 Neb. 93. The allegation in the information that the school is a parochial school is alone an allegation which apprises of the fact that it is a school that does present or is legally required to present the course of study mentioned, for parochial schools expressly come within the compulsory education act. Had it been a fact that this school had failed to comply with that act, that would not have absolved it from the duty of recognizing and obeying the provisions of the language law.

As to the contention that the information should have specifically charged that the teaching took place during school hours, it is only necessary to answer that an allegation that the teaching was in school carries with it the necessary implication that such teaching must have been during school hours. In order that any teaching take place "in school," it must take place when the pupils are assembled and when the school is in session. Otherwise, such teaching would not have been "in school," within the generally accepted meaning of the term so used.

Neither the language law nor the compulsory school act mentions the phrase "regular school hours." Nor is there any direction in either of those statutes as to how many hours a day, or as to what time of day, school shall be in session. The language law declares that certain

subjects shall not be taught in school. Obviously, it was intended that such teachings should not take place whenever the pupils of the school should be assembled in the school for the purpose of receiving instruction. So far, then, as it may have been indicated in the former opinion in *Nebraska District of Evangelical Lutheran Synod v. McKelvie, supra,* that the law was aimed to apply only to those school hours which should be set apart for the teaching of the so-called common school branches, or set apart as "regular school hours," we believe that opinion should be modified.

When the offense is a statutory one, and the statute sets forth what elements shall constitute the crime, it is sufficient in an information to describe the crime in the language of the statute, as was done in this case. *Philbrick v. State,* 105 Neb. 120; *Goff v. State,* 89 Neb. 287; *Cordson v. State,* 77 Neb. 416.

Again, it is insisted that the evidence is insufficient to support the verdict, and that the proof is that the teaching complained of did not take place during school hours. It appears from the evidence that the defendant had been a teacher in this school some eight years, and that the afternoon hours for teaching, during all that period of time, had been from 1 to 4 o'clock. After the decision in the case of *Nebraska District of Evangelical Lutheran Synod v. McKelvie, supra,* in which it was said that the statute aimed only at the teaching of foreign languages during "regular school hours," the church authorities, by resolution, changed the afternoon school hours so that they covered the period of from 1:30 to 4 o'clock, instead of from 1 to 4. The morning hours remained the same. Pupils, however, as before, each day assembled at 1 o'clock in the afternoon and were taught German, in the manner we have described, until the hour of 1:30, at which time regular school was said to commence. The defendant testified that attendance by the pupils during that half-hour was not compulsory. However, the attendance for that period was full and regular. We do

Meyer v. State.

not see that this, in reality, created any change in the "regular school hours." The court submitted for the jury's determination the question of whether or not the change of hours was a device to evade the law, and the question of whether the hour from 1 to 1:30 was a part of the teaching hours of the school. We think the instruction was properly given, and, in the light of the evidence, the only verdict which could have been expected was the one returned by the jury, finding the defendant guilty of the offense charged.

The judgment of the lower court is, therefore,

AFFIRMED.

LETTON, J., dissenting.

Without regard to the conclusion in the case, I dissent from the doctrine of the seventh paragraph of the syllabus and that portion of the opinion expressing the same view. This in effect overrules the very recent opinion of this court in *Nebraska District of Evangelical Lutheran Synod v. McKelvie,* 104 Neb. 93. The matter is of grave importance, since it involves the question as to the extent that a legislature may infringe upon the fundamental rights and liberty of a citizen protected by the state and federal Constitutions. I am unable to agree with the doctrine that the legislature may arbitrarily, through the exercise of the police power, interfere with the fundamental right of every American parent to control, in a degree not harmful to the state, the education of his child, and to teach it, in association with other children, any science or art, or any language which contributes to a larger life, or to a higher and broader culture.

Educators agree that the period of early childhood is the time that the ability to speak and understand a foreign or a classic language is the most easily acquired. Every parent has the fundamental right, after he has complied with all proper requirements by the state as to education, to give his child such further education in proper subjects as he desires and can afford. As was pointed out in *Nebraska District of Evangelical Lutheran Synod*

*v. McKelvie, supra,* the legitimate object of the statute has been accomplished when the basic and fundamental education of every child in the state has been acquired in the English language, instead of in the language of a foreign country.

The state has the right to manage and control in all particulars schools maintained by taxation; to place other schools under state supervision and to require the same general standards; but it has no right to prevent parents from bestowing upon their children a full measure of education in addition to the state required branches. Has it. the right to prevent the study of music, of drawing, of handiwork in classes or private schools under the guise of police power? If not, it has no power to prevent the study of French, Spanish, Italian, or any other foreign or classic language, unless such study interferes with the education in the language of our country, prescribed by the statute.

In *State v. Ferguson,* 95 Neb. 63, 73, it is said in the opinion by Judge Fawcett: "The public school is one of the main bulwarks of our nation, and we would not knowingly do anything to undermine it; but we should be careful to avoid permitting our love for this noble institution to cause us to regard it as all in all and *destroy both the God-given and constitutional right of a parent to have some voice in the bringing up and education of his children."*

We have said that the legislature cannot, under the guise of police regulation, arbitrarily invade personal rights, and that "The test when such regulations are in question is whether they have some relation to the public health or public welfare, and whether *such is, in fact, the end sought to be obtained."* *Smiley v. MacDonald* 42 Neb. 5; *In re Anderson,* 69 Neb. 686; *Union P. R. Co. v. State,* 88 Neb. 247; *State v. Withnell,* 91 Neb. 101.

Since the restriction cannot be supported on the ground of "public welfare," it is now sought to sustain it on the ground of "public health." The supposition that this re-

striction in the statute might have been inserted in the interest of the health of the child is evidently· an after-thought. It was not suggested by counsel either in the briefs or at the hearing. It is patent, obvious, and a matter of common knowledge that this restriction was the result of crowd psychology; that it is a product of the passions engendered by the World War,. which had not had time to cool. The idea that the legislature had in mind the protection of the child from over study, or lack of recreation, seems far-fetched, when it is realized that outside of city districts only 12 weeks school attendance in a year is required by the law, and that in city districts the hours of study for young children are carefully limited by the boards of education. The statute was construed and upheld (except as to the restriction now reinstated by the majority opinion) in the opinion in the *McKelvie* case written by me. It was there held (with that exception) to be a proper and salutary measure, upon substantially the same grounds as are now suggested in the majority opinion. The· doctrine of *stare decisis* should be applied, and the former opinion adhered to.

Legislatures have not always respected personal rights. In *State v. Junkin*, 85 Neb. 1, this court was compelled to hold invalid a law restricting free speech in a public assembly. Resistance to the arbitrary power of kings was necessary in days gone by. It seems now to be necessary to resist encroachments by the legislature upon the liberty of the citizen protected by the Constitution.

MORRISSEY, C. J., concurs in this dissent.