STATE OF NEBRASKA EX REL. PAUL L. DOUGLAS ET AL.,
APPELLEES, V.
FAITH BAPTIST CHURCH OF LOUISVILLE, NEBRASKA,
A CORPORATION, ET AL., APPELLANTS.

301 N.W.2d 571

Filed January 30, 1981.   No. 43029.

David C. Gibbs, Jr., and Charles E. Craze of Gibbs & Craze and Meyer Coren of Viren, Epstein, Leahy & Coren for appellants.

Paul L. Douglas, Attorney General, and Harold Mosher for appellees.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, BRODKEY, WHITE, and HASTINGS, JJ., and COLWELL, District Judge.

HASTINGS, J.

This was an action brought by the State of Nebraska on the relation of the Attorney General against Faith Baptist Church of Louisville, Nebraska, and certain individuals being officers and employees of the principal defendant. It sought to enjoin the operation of an elementary and secondary school by the defendants because there had been no compliance with the school laws of the State of Nebraska. From a judgment granting such relief, the defendants have appealed to this court. Upon consideration de novo on the record, we affirm.

The defendants claim that the trial court erred in granting the injunction because: (1) Criminal sanctions are the remedy prescribed by the applicable statutes rather than equitable relief; (2) The State of Nebraska through the State Department of Education has failed to abide by the same statutes and rules that it asks to be enforced against the defendants; (3) Enforcement of the school laws violates the defendants' ninth amendment rights to bear, raise, and educate their children as they see fit; and (4) Enforcement of the school laws violates the defendants' first amendment rights as to freedom of religion.

As a part of the factual background, it should be helpful to set out certain basic statutory provisions. Neb. Rev. Stat. § 79-201 (Reissue 1976) requires that every person having charge or control of any child between the ages of 7 and 16 "shall cause such child

to attend regularly the public, private, denominational, or parochial day schools each day that such schools are open and in session . . . ." Among other things, Neb. Rev. Stat. § 79-328 (Reissue 1976) requires that the State Board of Education shall have the power and duty to provide "supervision of the state school system"; to "establish . . . procedures for classifying, approving, and accrediting schools . . . for the continued legal operation of all schools"; and to "cause to be published laws and regulations governing the schools." In addition, the State Board of Education has caused to be promulgated and published Rule 14, which contains regulations and procedures for approving the continued legal operation of all schools. That rule provides: "Only school systems approved for continued legal operation by the State Board of Education are considered to be providing a program of instruction which is in compliance with the compulsory attendance laws." It goes on to set forth what the curriculum shall consist of, and prescribes for the use of necessary materials and equipment, the length of the school day and year, and requirements relating to health and safety. Additionally, it requires the filing of a "Fall Approval Report" and an "Annual Term Summary Report," and, in order for a school to become approved and remain so, it mandates that each professional staff member employed by the school must "hold a valid Nebraska certificate or permit issued by the State Board of Education legalizing him or her to teach the grades or subjects to which elected." Rule 21, also adopted by the State Board of Education, provides rules for the issuance of certificates and permits to teach in Nebraska schools. Generally speaking, in order to qualify for a regular certificate, it is necessary that the applicant have obtained a baccalaureate degree.

On August 29, 1977, the defendants began operating the Faith Christian School in Louisville, Nebraska. The curriculum employed by this school is that sup-

plied by Accelerated Christian Education (A.C.E.), and consists of a series of booklets called Packet of Accelerated Christian Education (PACE), which contain instructional information and self-test questions in various subjects and at different instructional levels. Each student works at his or her own speed, and, after completing each PACE and attaining a grade of at least 80 percent on the self test and the PACE test given under the supervision of the supervisor, moves on to the next sequentially numbered PACE. The teachers as such are supervisors who administer the tests and are available for helping a particular student who may be having difficulty. Their function is not to teach, but to monitor or supervise. The instruction is Bible-oriented. For example, PACE 25 in social studies is devoted to the first chapter of *Genesis*, and its outline topics include The Creation of the Heavens and the Earth, The Seven Days of Creation, and the Garden of Eden. PACE 7 in mathematics consists of problems in simple addition and subtraction, interspersed with biblical sayings and citations. One gets the impression that the method of instruction is not unlike a correspondence course, with the addition of helping supervisors.

In spite of requests from the various local and state school officials, the defendants have refused to furnish "third-day reports" containing the names and addresses of all students enrolled in their school, as required by Neb. Rev. Stat. § 79-207 (Reissue 1976). This is necessary so as to check parents' compliance with compulsory attendance laws. They have stated that they have not and will not request approval of their A.C.E. program, even though they have been told that it would be approved, and they have neglected and refused to employ accredited teachers and to seek approval from the State of Nebraska to operate their school. It is their position that the operation of the school is simply an extension of the ministry of the church, over which the State of Nebraska has no authority to approve or accredit.

According to the defendants, as expressed by defendant Everett Sileven, pastor of the defendant church, a Christian education is mandated by the Bible. He cites *Deuteronomy* 6:6,7, which, according to Today's English Version, states: "Never forget these commands that I am giving you today. Teach them to your children. Repeat them when you are at home and when you are away, when you are resting and when you are working." *Proverbs* 22:6 says: "Teach a child how he should live, and he will remember it all his life." And, although the record indicates a citation to *Ephesians* 5:4, undoubtedly the reference is to Chapter 6: "Parents, do not treat your children in such a way as to make them angry. Instead, raise them with Christian discipline and instruction." Their belief is that teaching is a way of life and not simply a 5-hours-a-day, 5-days-a-week proposition. It is the defendants' belief that the public schools of today are overrun with an increase in crime, drug and alcohol addiction, teacher assaults, vandalism, and disrespect for authority and property. Additionally, and basically, according to Mr. Sileven, secular humanism is the basic philosophy of the public educational system, which is in direct opposition to the defendants' belief in biblical Christianity. It is because of these beliefs that the Faith Christian School was organized. Defendants further maintain that, because their philosophy is Christian and that of the State Department of Education is not, the latter is not capable of judging the philosophy of the defendants' school. Finally, because the state school laws require inspection of the schools by the county superintendent, the defendants cannot submit to such control because the State has no right to inspect God's property.

According to the testimony of Stephen W. Sturtevant, a certified teacher currently employed by the Fletcher Christian Academy at Axtell, and a teacher for a total of 8½ years, he had examined the achievement tests administered to the Faith Christian School students.

Although there is no underlying basis in the record for any such conclusion, he stated as his opinion that the students at the defendant school were accomplishing the average amount of progress that most students probably were in Nebraska schools. Other witnesses, who qualified as experts in the field of education, ventured the opinion that the mere fact that a person held a baccalaureate degree did not mean that he or she would be a good teacher. Additional facts will be set forth throughout this opinion as may be required in discussing the various assignments of error.

Defendants' first assignment of error requires little comment. It is true that Neb. Rev. Stat. §§ 79-216 and 79-1707 (Reissue 1976) provide for penal sanctions in the event of violations of the various statutory provisions relating to compulsory education and operation of private, denominational, and parochial schools. However, that does not foreclose the possibility of injunctive relief. "[A] court of equity may properly afford injunctive relief where there has been a continuing and flagrant course of violations of the . . . law even though these acts may be subject to criminal prosecution." *State ex rel. Meyer v. Weiner,* 190 Neb. 30, 34, 205 N.W.2d 649, 651 (1973).

Defendants complain that the State of Nebraska has failed to abide by the same statutes and rules that it asks to be enforced against these defendants. Specifically, it alleges that the State Department of Education has neglected to supply county superintendents with a course of study as prescribed by Neb. Rev. Stat. § 79-312(6) (Reissue 1976), and has continued to increase the standards for teacher certification, contrary to Neb. Rev. Stat. § 79-1247.03 (Reissue 1976). Section 79-312 does provide, in part, that "The county superintendent shall: . . . (6) furnish to each district in the county a copy of the course of study for public schools, as prescribed by the State Department of Education . . . ." By Rule 14, the State Department of Education has set forth in detail the subjects re-

quired to be taught in both elementary and secondary schools, together with an explanation of the aims sought to be accomplished by each individual program. Implementation of the instructional program is left to the local school authorities to develop in order to meet the unique goals of the particular school community. The action of the state department seems to comply with the statutory mandate.

The standardized tests which the defendants complain have not been made available to all Nebraska students are actually the responsibility of the county superintendent to furnish, but are not mandatory. "The county superintendent shall: . . . furnish to each district . . . such written or printed questions for reviews based upon such course of study *as in his judgment are necessary or expedient.*" § 79-312(6) (emphasis supplied). The tests which the defendants complain have not been made available, contrary to law, are the responsibility of the county superintendent, to be guided by "as in his judgment are necessary or expedient."

As to teacher certification, the defendants point to § 79-1247.03, which states that the purpose of the so-called teacher certification law is "to provide more flexibility in the certification of qualified teachers . . . and not to increase any requirements for certificates to teach." Neb. Rev. Stat. § 1247.05 (Reissue 1976) then grants broad powers to the State Board of Education to adopt rules and regulations governing the issuance of teaching certificates to be based upon "earned college credit" as well as other factors deemed to be important to a determination of fitness to teach. Neb. Rev. Stat. § 79-1247.06 (Reissue 1976) mandates that the maximum educational requirement which the board may require for the first issuance of a teaching certificate shall be a baccalaureate degree. Interestingly enough, that section as originally enacted in 1963, along with the other sections pertaining to teacher certification, allowed as a maximum to teach

elementary grades in Class I and Class II schools the completion of 2 years of a 4-year program of college preparation. The section as it presently exists was enacted in 1976, which eliminated the reference to the 2-year requirement. To read the teacher certification law, as the defendants would have us do, would mean that the State Board of Education could never increase requirements for certification beyond that which it imposed in 1963. We reject that argument as wholly without foundation. The language in § 79-1247.03 was merely declarative of the Legislature's purpose in enacting the series of statutes. It has been modified by deletion of a portion of § 79-1247.06 as set out above. The state board, by enacting minimum requirements equal to, but not in excess of, the maximum provided by law has not violated that particular statute.

Defendants' contention as to violation of their first and ninth amendment rights will be considered together, because the question involved in both is the extent to which the State can, if at all, restrict these rights in the interest of assuring all children a quality basic education.

At first blush, it would appear that the case of *Meyerkorth v. State*, 173 Neb. 889, 115 N.W.2d 585 (1962), is squarely in point and dispositive of the case, to the prejudice of the defendants. There the issue involved was the constitutionality of various statutes of the State of Nebraska concerning compulsory school attendance, certification of teachers, and supervision of nonpublic schools, the forerunners of the statutes involved here. The plaintiffs there, seeking a declaration that those laws were unconstitutional as a violation of their first amendment rights, raised arguments similar to those with which we are here faced: "The plaintiffs argue that the certification of teachers . . . and the minimal school standards provided for . . . above set forth, and the regulations promulgated by the Nebraska Department of Education, have no relevance to the interests of the state in children not edu-

cated in public, tax-supported schools; that none of these . . . have any materiality to testing children educated in parochial schools to ascertain if they know the language of their country, understand its government, and are able to participate in the democratic process; and that the above-mentioned sections and regulations infringe upon the rights of the parent and the constitutional right guaranteed to the citizens of the State of Nebraska." *Meyerkorth* at 898, 115 N.W.2d at 590.

This court reviewed the holding of the U.S. Supreme Court in *Meyer v. Nebraska*, 262 U.S. 390, 43 S. Ct. 625, 67 L. Ed. 1042 (1923), and cited the following language: "'The power of the State to compel attendance at some school and to make reasonable regulations. for all schools, including a requirement that they shall give instructions in English, is not questioned.'" *Meyerkorth* at 900, 115 N.W.2d at 591. What the court, in *Meyer*, did hold was that the State of Nebraska could not prevent the teaching of the German language as an additional elective subject.

In *Meyerkorth*, we also cited *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S. Ct. 571, 69 L. Ed. 1070 (1925), which struck down an Oregon law requiring all children to attend a public school. We referred generally to certain language from that case which we now set forth verbatim directly from *Pierce:* "No question is raised concerning the power of the State reasonably to regulate all schools, to inspect, supervise, and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare." 268 U.S at 534.

This court concluded by saying: "As we view the statutes here involved, there is nothing arbitrary, unreasonable, or unconstitutional relating to the

qualifications of teachers to teach in the parochial, denominational, private, or public schools of this state or with the requirements of compulsory education and attendance at such schools." *Meyerkorth* at 904, 115 N.W.2d at 593.

However, it is the defendants' position that the test of reasonableness as declared in *Meyerkorth* must give way to one of compelling state interest, which, they allege, is the rule announced in *Wisconsin v. Yoder*, 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972). In that case, the defendants were members of the Old Order Amish religion, and, as such, did not believe in conventional education for their children beyond the eighth grade. It was their contention that because the children would return to the isolated agrarian community of their families, additional formal education was to be supplanted by vocational instruction received "on the job." As a result, they were prosecuted for failure to comply with Wisconsin's compulsory school-attendance law, which required attendance by children until they reached the age of 16. The trial court, although finding that the law "'does interfere with the freedom of the Defendants to act in accordance with their sincere religious belief' it also concluded that the requirement of high school attendance until age 16 was a 'reasonable and constitutional' exercise of government power . . . ." 406 U.S. at 213. However, the convictions were reversed by the Wisconsin Supreme Court, which latter judgment was affirmed by the U.S. Supreme Court.

Nevertheless, the *Yoder* court did recognize the principle upon which our decision in *Meyerkorth* was based. "There is no doubt as to the power of a State, having a high responsibility for education of its citizens, to impose reasonable regulations for the control and duration of basic education." 406 U.S. at 213. However, it went on to say: "It follows that in order for Wisconsin to compel school attendance beyond the eighth grade against a claim that such attendance

interferes with the practice of a legitimate religious belief, it must appear either that the State does not deny the free exercise of religious belief by its requirement, or that there is a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause." 406 U.S. at 214.

In dealing with the question of the sincerity of the religious beliefs of the Amish, the *Yoder* court pointed out that "A way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations . . . ." 406 U.S. at 215. Although it is always difficult and perhaps inappropriate to challenge what others say their religious beliefs may be (in the case under consideration the defendants simply state that they believe they are biblically mandated to teach their children themselves), the *Yoder* court then encountered no such problem. "In sum, the unchallenged testimony of acknowledged experts in education and religious history, almost *300 years* of consistent practice, and strong evidence of a sustained faith pervading and regulating respondents' entire mode of life support the claim that enforcement of the State's requirement of compulsory formal education after the eighth grade would gravely endanger if not destroy the free exercise of respondents' religious beliefs." 406 U.S. at 219 (emphasis supplied). Although the record in the case before us demonstrates an educational practice of less than 2 years' duration, for the sake of this decision we assume the sincerity of their religious beliefs.

The *Yoder* court then introduced the "compelling interest" standard. "We turn, then, to the State's broader contention that its interest in its system of compulsory education is so compelling that even the established religious practices of the Amish must give way. . . .

"The State advances two primary arguments in support of its system of compulsory education. It

notes . . . that some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence. Further, education prepares individuals to be self-reliant and self-sufficient participants in society. We accept these propositions." 406 U.S. at 221. But then the court reached the heart of the basis for its decision: "However, the evidence adduced by the Amish in this case is persuasively to the effect that an additional one or two years of formal high school for Amish children in place of their long-established program of informal vocational education would do little to serve those interests . . . . It is one thing to say that compulsory education for a year or two beyond the eighth grade may be necessary when its goal is the preparation of the child for life in modern society as the majority live, but it is quite another if the goal of education be viewed as the preparation of the child for life in the separated agrarian community that is the keystone of the Amish faith." 406 U.S. at 222.

The majority opinion in *Yoder*, then, although employing a "compelling interest" rule, nevertheless was greatly, if not completely, influenced by the process of balancing the specific interest of the state in 1 or 2 years of education beyond the eighth grade for students not expected to enter the mainstream of modern-day life against competing religious principles and practices nearly 3 centuries old. It is somewhat difficult to develop a generalized rule from the court's specific holding. The concurring opinion of Mr. Justice White, with whom, however, Mr. Justice Brennan and Mr. Justice Stewart joined, is more illuminating of the rule in its general application. "This would be a very different case for me if respondents' claim were that their religion forbade their children from attending any school at any time *and from complying in any way with the educational standards set by the State.*" 406 U.S. at 238 (emphasis sup-

plied). And continuing: "As recently as last Term, the Court re-emphasized the legitimacy of the State's concern for enforcing minimal educational standards, *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971)." (In *Lemon v. Kurtzman*, 403 U.S. 602, 613, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971), the court said: "A State always has a legitimate concern for maintaining minimum standards in all schools it allows to operate.") Mr. Justice White goes on to say in *Yoder: "Pierce v. Society of Sisters* [citations omitted] lends no support to the contention that parents may replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society; in *Pierce,* both the parochial and military schools were in compliance with all the educational standards that the State had set, and the Court held simply that while a State may posit such standards, it may not pre-empt the educational process by requiring children to attend public schools." 406 U.S. at 239.

Defendants cite *State v. Whisner*, 47 Ohio St. 2nd 181, 351 N.E.2d 750 (1976), as supporting their position, an opinion by Celebrezze, J., who relies in no little measure upon the writings of Thoreau: "'If a man does not keep pace with his companions, Perhaps it is because he hears a different drummer. Let him step to the music which he hears, However measured or far away.'" *Id.* at 216, 351 N.E.2d at 771. Of course, it was just such philosophical prose which the *Yoder* court rejected as the basis for its judicial pronouncements: "Thus, if the Amish asserted their claims because of their subjective evaluation and rejection of the contemporary secular values accepted by the majority, much as Thoreau rejected the social values of his time and isolated himself at Walden Pond, their claims would not rest on a religious basis. Thoreau's choice was philosophical and personal rather than religious, and such belief does not rise to the demands of the Religion Clauses." 406 U.S. at 216. Also, the Ohio court

set forth phrase after phrase wherein it pointed out that the Board of Education recited how the inspections shall be conducted; not only how long the instructional day should be but what percentage shall be devoted to each particularized course, leaving no time for biblical and spiritual training; required a minimum number of pupils; required that "all activities *shall conform to policies adopted by the board of education*" (emphasis supplied); that there shall be cooperation and interaction between the school and the community; that each school shall give evidence of "cooperative assessment of community needs to determine the purposes . . . for future educational improvement"; that child study information shall not be released to the parents; and that organized group life shall act in accordance with established rules of social controls. We would be inclined to agree with the Ohio court's statement that "these standards are so pervasive and all-encompassing that total compliance with each and every standard by a non-public school would effectively eradicate the distinction between public and non-public education, and thereby deprive these appellants of their traditional interest as parents to direct the upbringing and education of their children." 47 Ohio St. 2d at 211-12, 351 N.E.2d at 768. However, such requirements are not found among the statutory mandates of our laws.

Finally, defendants refer us to *Kentucky State Bd., Etc. v. Rudasill*, 589 S.W.2d 877 (Ky. 1979), in which the author of that opinion, testing school certification statutes against a constitutional provision which provided that "nor shall any man be compelled to send his child to any school to which he may be conscientiously opposed," wrote the following: "Certainly, the receipt of 'a bachelor's degree from a standard college or university' is an indicator of the level of achievement, but it is not a sine qua non the absence of which establishes that private and parochial school teachers are unable to teach their students to intelli-

gently exercise the elective franchise." 589 S.W.2d at 884. However, to the contrary is an opinion from the Supreme Court of Alaska which held that a requirement that an applicant must have graduated from a law school accredited by the American Bar Association as a prerequisite for admission to the bar of Alaska did not deprive the applicant of his constitutional rights. "While there is some risk that a person could be deprived of the opportunity to practice law by reason of the bar rule, even though he is competent to practice law, we believe that such a risk is outweighed by the difficulty which would be presented by making a case-by-case determination of whether the education afforded by an unaccredited law school was comparable to that given by an accredited school. We have already noted the difficulty of employing such an alternative procedure.

"The ABA system of accreditation is sophisticated and time-consuming. We can think of no effective substitute which could be developed at the state level without diverting impractical amounts of manpower and money into such an inquiry! Given the strong state interest in assuring that those entering the practice of law have had suitable training in adequate institutions, and considering the precedent from other jurisdictions, we are of the opinion that the Alaska bar rule requirement is valid and does not violate the due process clause of either the Alaska Constitution or the United States Constitution." *Application of Urie,* 617 P.2d 505, 508 (Alaska 1980).

We are not suggesting as an absolute that every person who has earned a baccalaureate degree in teaching is going to become a good teacher, any more than one who has obtained the appropriate training and education will become a good engineer, lawyer, beauty operator, welder, or pipefitter. However, we think it cannot fairly be disputed that such a requirement is neither arbitrary nor unreasonable; additionally, we believe it is also a reliable indicator of the

probability of success in that particular field. We believe that it goes without saying that the State has a compelling interest in the quality and ability of those who are to teach its young people.

The cases we have cited from the Supreme Court of the United States should leave no doubt as to the critical interest which the State has in the quality of the education provided its youth. Although parents have a right to send their children to schools other than public institutions, they do not have the right to be completely unfettered by reasonable government regulations as to the quality of the education furnished. Defendants insist that this can be accomplished by annual comparative tests. The problem with testing is that it sometimes comes too late. If the deficiency of the education being afforded is not discovered until the end of the year, the child has wasted that year. The requirements as to curriculum as imposed by the state board appear to be very minimal in nature. All that is required is that certain subjects be taught. There is no effort to dictate in what manner that knowledge shall be imparted. As a matter of fact, the defendants have complained, in part, because no course of study has been prescribed by the State. This is not the type of regulation which the *Whisner* court found objectionable. The defendants concede, and the State confirms, that the curriculum utilized by the defendants, the A.C.E. program, is acceptable and approved and being used by other schools within the state. The refusal of the defendants to comply with the compulsory education laws of the State of Nebraska as applied in this case is an arbitrary and unreasonable attempt to thwart the legitimate, reasonable, and compelling interests of the State in carrying out its educational obligations, under a claim of religious freedom.

The judgment of the District Court is affirmed.

AFFIRMED.

KRIVOSHA, C.J., concurring in part, and in part dissenting.

I find that I must in part concur with, and in part dissent from, the majority opinion in this case.

I concur in that portion of the majority opinion which holds that the State, having a high responsibility for the education of its citizens, has the power to impose *"reasonable regulations"* for the control and duration of basic education. I believe that principle applies even though the reasonable regulations may, in some manner, affect what an individual or group maintains is their religious belief. Neither the U.S. Const. art. I nor art. IX, nor the corresponding sections of our own state Constitution, grants individuals or groups carte blanche authority to reject all State control over their activity in the name of religion.

Early in our nation's history, we were called upon to make such decisions. In 1878 the U.S. Supreme Court, in the case of *Reynolds v. United States*, 98 U.S. 145, 25 L. Ed. 244 (1878), was called upon to determine the validity of Utah's prohibition against polygamy, a practice of the Mormon religion. In upholding the Utah law against a claim that the prohibition violated the Mormons' freedom of religion, the U.S. Supreme Court reviewed the history of our Constitution, and in particular the first amendment. It concluded from that examination that while polygamy may have its basis in the Old Testament, it could, nevertheless, be outlawed in this country. In doing so, the U.S. Supreme Court held that a party's religious belief could not be accepted as a justification for his committing an overt act made criminal by the law of the land. That view has prevailed throughout the history of our country and was recently repeated in the case of *Wisconsin v. Yoder*, 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15, 27-28 (1971), wherein Chief Justice Burger noted: "It is true that activities of individuals, even when religiously based, are often subject to regulation by the States in the exercise of

their undoubted power to promote the health, safety, and general welfare, or the Federal Government in the exercise of its delegated powers. See, *e.g., Gillette v. United States,* 401 U.S. 437 [91 S. Ct. 828, 28 L. Ed. 2d 168] (1971); *Braunfeld v. Brown,* 366 U.S. 599 [81 S. Ct. 1144, 6 L. Ed. 2d 563] (1961); *Prince v. Massachusetts,* 321 U.S. 158 [64 S. Ct. 438, 88 L. Ed. 645] (1944); *Reynolds v. United States,* 98 U.S. 145 [25 L. Ed. 244] (1879)." *Id.* at 220. It would seem clear, beyond debate, that if a group claimed a first amendment right to reestablish the ancient Temple requirements of twice-daily animal sacrifices, the State, under proper conditions, could prohibit such act. The right of one's religious freedom does not totally eliminate the State's right to regulate the health, safety, and welfare of its citizens in an appropriate case.

Appellants' claim that the Bible prohibits them from permitting the State any supervisory right over the education of their children fails by reason of the very argument itself. Appellants contend their right to be exempt from all governmental supervision in regard to the education of their children stems from the biblical requirements concerning the education of children and, therefore, clearly falls within the protection granted by the first amendment. Appellants' biblical argument, however, fails to consider all of the requirements relating to their position. In particular, their position fails to recognize the ancient Rabbinic principle first laid down by the Babylonian Jewish Scholar Samuel, and known as *dina de-malkhuta dina,* a halakhic rule that the law of the country is binding and in certain cases is to be preferred. Under this doctrine, one may not ignore the secular law of the country in which one lives.

As noted by a host of decisions from various jurisdictions, a State, having a high responsibility for the education of its citizens, may impose reasonable regulations for the control and duration of basic education. See *Pierce v. Society of Sisters,* 268 U.S. 510,

534, 45 S. Ct. 571, 69 L. Ed. 1070 (1925). For that reason I, therefore, have no difficulty in agreeing with the majority opinion insofar as it holds that the State may adopt reasonable regulations which require a teaching institution, public or private, to submit its curriculum for examination and approval; or to disclose the attendance of its students; or even to subject its students to periodic testing. Such action would not, in my mind, constitute a violation of the religious clauses of either the United States Constitution or the Nebraska Constitution.

However, based upon the record in this case, I must respectfully dissent from that portion of the majority opinion which in effect upholds the State's requirement that all elementary and secondary teachers, public or private, hold a baccalaureate degree before a student's attendance at such school may satisfy the State's compulsory attendance laws. I do not believe either logic or experience, or current law, justifies such a conclusion.

Just as no group may obtain a first amendment exemption from all State regulations by merely asserting that the regulated activity has some basis in a religious belief, neither can the State regulate or control all action of a group under the bald assertion that such regulation is necessary to preserve and maintain the health, safety, or welfare of such group. We have traditionally attempted to balance those concepts and have diligently sought to find a reasonable middle ground. As Chief Justice Burger wrote in *Yoder, supra* at 214-15: "Thus, a State's interest in universal education, however highly we rank it, is not totally free from a balancing process when it impinges on fundamental rights and interests, such as those specifically protected by the Free Exercise Clause of the First Amendment, and the traditional interest of parents with respect to the religious upbringing of their children so long as they, in the words of *Pierce*, 'prepare [them] for additional obligations.'
. . . .

"The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion. We can accept it as settled, therefore, that, however strong the State's interest in universal compulsory education, it is by no means absolute to the exclusion or subordination of all other interests. *E. g.*, *Sherbert v. Verner*, 374 U.S. 398 [83 S. Ct. 1790, 10 L. Ed. 2d 965] (1963); *McGowan v. Maryland*, 366 U.S. 420, 459 [81 S. Ct. 1101, 6 L. Ed. 2d 393] (1961) (separate opinion of Frankfurter, J.); *Prince v. Massachusetts*, 321 U.S. 158, 165 [64 S. Ct. 438, 88 L. Ed. 645] (1944)."

In this case, I believe that we have failed to bring about the necessary balance and have unnecessarily opted in favor of the State when such result is neither required nor justified.

Time has adequately disclosed to us the hazards of attempting to determine in the abstract what is necessary and proper in providing children with an eduation. It would not require a great deal of research to establish that whatever steps we have taken heretofore in our effort to ensure a meaningful education for our children have not accomplished our objectives.

Likewise, we may find examples in our own state which prove the hazards of attempting to determine what is truly necessary to ensure education. In 1919 the Legislature, in what it then believed to be its infinite wisdom, enacted a law making it unlawful to teach a foreign language to a student before the student attained and successfully passed the eighth grade. This court, in affirming the constitutionality of that act, finding it a valid exercise of the State's police power, wrote, in part, as follows: "The salutary purpose of the statute is clear. The legislature had seen the baneful effects of permitting foreigners, who had taken residence in this country, to rear and educate their children in the language of their native land. The result of that condition was found to be inimical

to our own safety. To allow the children of foreigners, who had emigrated here, to be taught from early childhood the language of the country of their parents was to rear them with that language as their mother tongue. It was to educate them so that they must always think in that language, and, as a consequence, naturally inculcate in them the ideas and sentiments foreign to the best interest of this country. The statute, therefore, was intended not only to require that the education of all children be conducted in the English language, but that, until they had grown into that language and until it had become a part of them, they should not in the schools be taught any other language. The obvious purpose of this statute was that the English language should be and become the mother tongue of all children reared in this state. The enactment of such a statute comes reasonably within the police power of the state." See *Meyer v. State*, 107 Neb. 657, 661-62, 187 N.W. 100, 102 (1922).

In striking down the law and rejecting the logic of our opinion, the U.S. Supreme Court, in the case of *Meyer v. Nebraska*, 262 U.S. 390, 400, 43 S. Ct. 625, 67 L. Ed. 1042 (1923), said: "The American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted. . . . Corresponding to the right of control, it is the natural duty of the parent to give his children education suitable to their station in life; and nearly all the States, including Nebraska, enforce this obligation by compulsory laws."

"It is well known that proficiency in a foreign language seldom comes to one not instructed at an early age, and experience shows that this is not injurious to the health, morals or understanding of the ordinary child." *Id.* at 403.

That general notion was again approved in *Pierce v. Society of Sisters*, *supra*, wherein the U.S. Supreme Court was called upon to examine the Oregon compulsory education act. In striking down an Oregon law

requiring all children between the ages of 8 and 16 years to attend the public schools as an unlawful and unconstitutional interference with the liberty of parents and guardians to direct the upbringing and education of children under their control, the U.S. Supreme Court said at 534, in part: "Under the doctrine of *Meyer v. Nebraska*, 262 U. S. 390 [43 S. Ct. 625, 67 L. Ed. 1042], we think it entirely plain that the Act of 1922 unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control. As often heretofore pointed out, rights guaranteed by the Constitution may not be abridged by legislation which has no reasonable relation to some purpose within the competency of the State. The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."

While I recognize that we do not require attendance in a public school, but will certify a private school if its teachers all hold baccalaureate degrees, I find nothing either in our statutes or in logic which compels a conclusion that one may not teach in a private school without a baccalaureate degree if the children are to be properly educated. Under our holding today, Eric Hoffer could not teach philosophy in a grade school, public or private, and Thomas Edison could not teach the theories of electricity. While neither of them could teach in the primary or secondary grades, both of them could teach in college. I have some difficulty with a law which results in requiring that those who teach must have a baccalaureate degree, but those who teach those who teach need not. The logic of it escapes me. The experience of time has failed to establish that

requiring all teachers to earn a baccalaureate degree from anywhere results in providing children with a better education.

While it may be appropriate for a state to set such requirements in a public school where state funds are expended and, in effect, the state is the employer, I find no basis in law or fact for imposing a similar requirement in a private school. The failure of the private school to have as adequate and as trained teachers as the public school may be a factor which parents will take into account in deciding whether their children should be enrolled in that private school. I do not believe, however, that it should disqualify children from satisfying the compulsory attendance laws. I could accept a regulation which required instructors in such schools to satisfy the state that they were adequately trained to perform the functions they were hired to perform. I believe, however, that such functions may be adequately performed absent a baccalaureate degree.

I am of the opinion that our Legislature also holds that view. There are at least two specific statutory provisions concerning teachers which lead one to that conclusion. Neb. Rev. Stat. § 79-1247.05 (Reissue 1976) specifically provides that regulations with regard to the issuance of certificates shall be "based upon earned college credit, or *the equivalent thereto* . . . ." (Emphasis supplied.) It is difficult to imagine how "the equivalent thereto" can be satisfied if the college degree is the minimum requirement. Obviously, the Legislature concluded that something other than classroom attendance in a college would be sufficient to satisfy certain educational requirements of a teacher.

And, likewise, as argued by appellants, Neb. Rev. Stat. § 79-1247.06 (Reissue 1976) provides, in part, that the *"maximum"* requirement which the State Board of Education may impose on one seeking certification is a baccalaureate degree. Yet, by mere rule, the state board has converted the maximum require-

ment into a minimum requirement. This action taken by the state board in promulgating Rule 21 appears to me to constitute the exercise of undelegated legislative authority and may, therefore, be void. See *Lincoln Dairy Co. v. Finigan*, 170 Neb. 777, 104 N.W.2d 227 (1960).

The record in this case clearly establishes that the failure of all instructors in appellants' school to hold a baccalaureate degree has not in any manner detracted from the quality of the education being given its students. No evidence was offered that, absent a baccalaureate degree, one is not qualified to teach. Likewise, the State conceded at oral argument before this court that the program of instruction offered by appellant school was, indeed, satisfactory, and if submitted to the State for approval, would undoubtedly be approved. Yet that approval would not result in the school's being certified or in the students' status being such as to satisfy the compulsory attendance law. That defect could not be cured unless and until all instructors held a baccalaureate degree, as if the earning of such a degree somehow magically bestowed upon the recipient that knowledge which one without such a degree could not otherwise obtain.

Even the State Board of Education has recognized that the obtaining of a degree may, under certain circumstances, be waived. Rule 21-(70) of the rules adopted by the State of Nebraska Department of Education under date of July 8, 1977, provides for the issuance of an emergency teaching certificate. The bases upon which such certificate may be issued are, in part: "[T]o legalize the payment of a salary from tax sources to a person not fully qualified for a regular teaching certificate required for the position to be filled; or to legalize the employment in a private, parochial or denominational school of a person not fully qualified for a regular teaching certificate required for the position to be filled."

While it is true that there are further requirements

of that rule which ultimately may compel the individual to obtain a baccalaureate degree, one must ask the question: If the holding of such a degree is so critical as to affect the education of a child, why does the State Board of Education waive it under any circumstance? Obviously, the requirement of holding such a degree is not so indispensable to the providing of a good and sufficient education that it must be required under all circumstances and at all times.

It may be argued, as the State does, that any other requirements would impose a severe burden upon the State, in that it would then be required to conduct various tests of students in these schools in order to determine whether, in fact, they are receiving an adequate education. No one, however, has ever suggested that the mere fact that action required to be performed by the government may be difficult justifies the government's refusal to perform the required act.

The majority points out that to wait until after a period of time has expired before we test the students may be too late. If the holding of a baccalaureate degree by a teacher in and of itself ensured that students would thereby be educated and able to pass the test, that argument might wash. Experience, however, discloses that students taught by teachers holding baccalaureate degrees do not necessarily receive an adequate education in each and every instance. The record in this case supports that view. Witnesses who qualified as experts in the field of education ventured the opinion that the mere fact that a person held a baccalaureate degree did not mean that he or she would be a good teacher.

In my view, attempting to strike a balance between the various interests of the parties herein does not justify requiring that all persons teaching in appellants' school can qualify as a teacher only by holding a baccalaureate degree. I believe there are other reasonable regulations which can be adopted for private

schools that would permit these schools to continue, thereby striking the necessary balance between the two competing interests. I would have so held.