**BANGOR BAPTIST CHURCH, et al., Plaintiffs,**

v.

**STATE OF MAINE, DEPARTMENT OF EDUCATIONAL AND CULTURAL SERVICES, and Harold Raynolds, Jr., Commissioner, Defendants.**

Civ. A. No. 81–0180–B.

United States District Court, D. Maine.

Oct. 26, 1982.

---

Kevin M. Cuddy, Bangor, Me., William B. Ball, Philip J. Murren, Kathleen A. O'Malley, Harrisburg, Pa., for plaintiffs.

Ellen E. George, William R. Stokes, Asst. Attys. Gen., Augusta, Me., for defendants.

## MEMORANDUM DECISION

CYR, District Judge.

The Court is presented with a motion to dismiss the complaint for failure to state a claim upon which relief can be granted, which is accompanied by matters outside the pleadings, not excluded by the Court, and is to be treated as a motion for summary judgment. Fed.R.Civ.P. 12(b). *Medina v. Rudman,* 545 F.2d 244, 247 (1st Cir.1976). The parties have supplemented the record, both before and after oral argument, with affidavits and memoranda of law.

The plaintiffs include fundamentalist Christian churches, teachers, pastors, parents and an association of fundamentalist Christian schools. The defendants are the Maine Department of Educational and Cultural Services [Department] and the Commissioner of Educational and Cultural Services [Commissioner].

The amended complaint, which seeks declaratory and injunctive relief, as well as costs and counsel fees, alleges that certain provisions of the Maine Compulsory Education Law,[1] 20 M.R.S.A. §§ 102.7, 911.3, 1281 & 1286, are violative of the First, Ninth,

---

1. On April 15, 1982 the Maine Legislature repealed the education laws codified in title 20, Maine Revised Statutes Annotated, and enacted title 20–A, effective July 1, 1983. *See* 1982 Me.Legis.Serv. No. 4, Laws 1982, c. 693.

Part 2, chapter 117, subchapter I of the new education laws sets out the approval requirements and procedures applicable to private schools. The five sections of the subchapter read as follows:

§. 2901. *Requirement for basic school approval*

A private school may operate as an approved private school for meeting the requirement of compulsory school attendance under section 5001 if it:

1. *Hygiene, health, safety.* Meets the standards for hygiene, health and safety under Titles 22 and 25; and

2. Is either:

A. Currently accredited by the New England Association of Colleges and Secondary Schools; or

B. Meets the department's requirements for approval for attendance purposes under section 2902.

§ 2902. *State requirements*

Private schools approved for attendance purposes by the department shall:

1. *Immunization.* Comply with the immunization provisions under section 6351;

2. *Language of instruction.* Use English as the language of instruction except as specified under section 4602;

3. *Courses required by statute.* Provide instruction in history as specified under section 4601, subsection 1 and English as specified in section 4601, subsection 2;

4. *Commissioner's basic curriculum.* Provide instruction in the basic curriculum es-

and Fourteenth Amendments to the Constitution of the United States.

The fundamental statutory provision brought under constitutional challenge by the plaintiffs is 20 M.R.S.A. § 911, which requires every child between the ages of 7 and 17[2] to attend a public school, unless receiving "equivalent instruction in a private school ... [provided] the equivalent instruction is approved by the commissioner."

Title 20, Maine Revised Statutes Annotated, section 102.7, which directs the defendant commissioner, *inter alia,* to "...

tablished by rule by the commissioner under section 4601, subsection 4;

5. *Certified teachers.* Employ only certified teachers;

6. *Secondary schools.* For private secondary schools:

A. Meet the requirements of a minimum school year under section 4801;

B. Provide a school day of sufficient length to allow for the operation of its approved education program;

C. Have a student-teacher ratio of not more than 30 to one;

D. Include not less than 2 consecutive grades from 9 to 12; and

E. Maintain adequate, safety (sic) protected records; and

7. *State board rules.* Meet the requirements applicable to the approval of private schools for attendance purposes established by the state board pursuant to section 405, subsection 3, paragraph E.

§ 2903. *Governing body requirements*

Nothing in this subchapter shall restrict the authority of the governing body of a private school to require additional subjects to be taught in their school.

§ 2904. *Removal of basic approval*

1. *Commissioner may remove basic approval.* Notwithstanding any other provision of law, the commissioner may remove basic approval from any private school for failure to meet applicable approval requirements.

2. *Procedural requirements.* Whenever a school fails to meet these requirements the commissioner shall:

A. Give due notice; and

B. Hold a hearing.

3. *Hearing.* The hearing on removal of basic approval shall be in accordance with the applicable provisions of the Maine Administrative Procedure Act, Title 5, chapter 375 and rules of the state board adopted pursuant to section 405, subsection 3, paragraph E.

§ 2905. *Nonrenewal of basic approval*

The decision of the commissioner on nonrenewal of basic approval of any school applying for renewal shall be in accordance with the Maine Administrative Procedure Act, Title 5, chapter 375 and rules adopted by the State Board of Education under section 405, subsection 3, paragraph E.

The provisions regarding course requirements referred to in § 2902 are as follows:

§ 4601. *Basic curriculum*

1. *Required courses in American and Maine history.* The following courses shall be required.

A. American history and civil government, including the Constitution of the United States, the Declaration of Independence, the importance of voting and the privileges and responsibilities of citizenship, shall be taught in and [be] required for graduation from all elementary and secondary schools both public and private.

B. A course in the history [of Maine], including the Constitution of Maine, Maine geography and the natural and industrial resources of Maine[,] shall be taught in at least one grade from grade 7 to grade 12, in all schools, both public and private.

2. *English.* Four years of English shall be required for graduation from a secondary school.

. . . .

4. *Courses prescribed by the commissioner.* The commissioner shall prescribe by rule the basic curriculum to be taught in public schools.

The minimum school year requirements referred to in § 2902(6)(A) are as follows:

§ 4801. *School days*

The following provisions shall apply to school days.

1. *Number.* A school administrative unit shall make provision for the maintenance of all of its schools for at least 180 days a year. At least 175 days shall be used for instruction. In meeting the requirement of a 180-day school year, no more than 5 days may be used for in-service education of teachers, administrative meetings, parent-teacher conferences, records' days and similar activities.

A. The commissioner may reduce or waive the minimum number of days required on application from a school board. The application must be supported in writing with a statement of the reasons for the request.

Section 405(3)(E) of the new law, referred to in § 2902(7), reposes in the State Board of Education [Board] the power and duty to "[a]dopt or amend rules on requirements for approval and accreditation of elementary and secondary schools."

2. Exceptions to this requirement are found in 20 M.R.S.A. § 911.1.A.

prescribe the studies to be taught in the public schools and in the private schools approved for attendance ..."[3] and permits the Commissioner to "remove basic approval from any school for cause," is also assertedly unconstitutional.

Plaintiffs further challenge various requirements for the approval of private *secondary* schools imposed pursuant to 20 M.R. S.A. § 1281 (Supp.1981), which mandates that "[t]he secondary schools of this State shall be evaluated for basic approval ..." and establishes ten basic requirements.[4] The specific requirements for state approval of *private* secondary schools to which plaintiffs object are: (1) that each school maintain "a course of study approved by the defendant commissioner;"[5] (2) that

**3.** 20 M.R.S.A. § 102.7 (Supp.1981). Section 102.7 further provides:

> American history and civil government, including the Constitution of the United States and the Declaration of Independence, the importance of voting and the privileges and responsibilities of citizenship, shall be taught in all schools of elementary and secondary grades, both public and private, and American history and civil government shall be required for graduation from all elementary schools, both public and private ...; [a] course in history, geography and the natural and industrial resources of Maine shall be taught in at least one grade from 7 to 12, in all school systems, both public and private.
>
> The officers in charge of a private school founded after September 3, 1965 shall furnish the commissioner with a copy of the course of study arranged by said officers.
> ....
> Notwithstanding any other section of law, the commissioner may remove basic approval from any school for cause. Whenever a school fails to meet requirements, the commissioner shall give due notice and shall hold a hearing. If the school fails to comply and does not take necessary remedial action, the commissioner may remove basic approval.
> 20 M.R.S.A. § 102.7 (Supp.1981).

**4.** *§ 1281. Requirements*

> The secondary schools of this State shall be evaluated for basic approval and may be evaluated for accreditation. No school shall be given basic approval for attendance, tuition or subsidy purpose (sic) within this Title unless it meets the following requirements:
> 1. *Course of study approved.* It maintains a course of study approved by the commissioner. [20 M.R.S.A. § 1281(1) (1964) ].
> 2. *Length of school day.* It has a school day of sufficient length to allow the operation of its educational program as approved by the commissioner.
> 3. *Minimum school year.* It has a minimum school year of 180 school days, of which not less than 175 shall be actual school days and no more than 5 may be devoted to in-service education of teachers, administrative meetings, parent-teacher conferences, record days and other such teacher work activities. The State Board of Education shall have the right to reduce or waive the minimum number of days

required upon application from any school committee, board of directors or board of trustees of any academy in the State, such application to be supported in writing with a statement of the reasons for such request.
> 4. *Certified teachers.* It employs only certified teachers.
> 5. *Pupil-teacher ratio.* It has a pupil-teacher ratio of not more than 30 to one. [20 M.R. S.A. § 1281(5) (1964) ].
> 6. *Hygienic facilities and equipment.* It has safe and hygienic facilities, adequate equipment and supplies, all of which comply with the regulations established by the Department of Human Services and the Department of Educational and Cultural Services.
> 7. *Consecutive grades.* It is organized to include not less than 2 consecutive grades from 9 to 12.
> 8. *Requirements for graduation.* The requirements for graduation shall include American history and 4 years of English in a planned program approved by the Commissioner of Education. Notwithstanding the foregoing, a student who has satisfactorily completed the freshman year in a degree-granting institution may receive a secondary school diploma from the school he last attended.
> 9. *Records.* It has adequate, safely protected records. [20 M.R.S.A. § 1281(9) (1964) ].
> 10. *Size.* Any public school enrolling fewer than 100 pupils may be approved by the State Board of Education on an emergency or continuing basis only after the school committee or board of directors have (sic) presented in detail reasons for such emergency or continuing approval. Any such school which is adjudged by the board to be geographically isolated shall receive the board's approval for a 6-year period subject to the right of the board to terminate its approval, on the ground of size, only if the school receives at least 5-years' notice of such termination, and subject also to the satisfactory meeting in every case of the other requirements of this section.
> 20 M.R.S.A. § 1281 (Supp.1981).

**5.** The amended complaint also alleges that 20 M.R.S.A. § 1286 interferes with "the religious mission of the [plaintiff] churches." The challenge to § 1286 does not, however, pose any additional or different issues not raised by the challenge to § 1281.1.

each school employ "only certified teachers;"[6] and (3) that each school have "a pupil-teacher ratio of not more than 30 to one."[7]

Plaintiffs contend that the Commissioner has sought to impose these statutory requirements and various regulations promulgated in furtherance thereof upon plaintiffs' church-schools. Plaintiffs assert that they have refused to comply for reasons of religious conviction, insofar as the statutes and regulations require greater burdens than plaintiffs acknowledge to be the lawful province of the defendants to impose. Plaintiffs insist that compliance would substantially limit and interfere with their religious mission and permit state surveillance of church-schools, review of their church-school programs and other excessive entanglements.

The amended complaint pleads constitutional violations in five counts: (1) violation of the Free Exercise Clause of the First Amendment and denial of parental rights guaranteed by the Ninth Amendment; (2) violation of the Establishment Clause of the First Amendment; (3) violation of the Due Process Clause of the Fourteenth Amendment, in that the challenged statutes and regulations promulgated thereunder are "impermissibly vague, overbroad, *ultra vires* and improperly delegate legislative authority to administrative personnel;" (4) violation of the First, Ninth, and Fourteenth Amendments, by depriving plaintiffs of parental, property, and enterprise rights; and (5) violation of the First, Ninth, and Fourteenth Amendments, by denying plaintiffs their rights "in education to express, transmit, or receive ideas."

The defendants deny most of the material allegations of the amended complaint for the reason that they are without sufficient knowledge or information upon which to form a belief as to the truth of the matters asserted. Defendants invoke the ancillary jurisdiction of the Court by way of counterclaim against nine church-school plaintiffs and against persons, known and unknown to defendants, charged with the direction of the church-school defendants-in-counterclaim, for declaratory and injunctive relief aimed at the implementation of the compulsory education laws of the State of Maine. The second claim for relief asserted in defendants' counterclaim seeks a judicial declaration that certain church-school plaintiffs cannot qualify for initial school approval absent prior compliance with state health, sanitation, fire, and safety requirements. Plaintiffs admit that the nine church-school defendants-in-counterclaim are operating private schools without the approval of the Commissioner and that they have refused to provide the information required by the Commissioner, except information relating to state fire, safety, health and sanitation standards.[8] By way of affirmative defense to the counterclaims, the defendants-in-counterclaim reassert each of the constitutional claims alleged in their amended complaint and further allege that the plaintiffs-in-counterclaim will suffer no irreparable harm and have an adequate remedy at law.

## I

## FACTS

Title 20 M.R.S.A. § 911.1.A mandates that "[e]very, child between his 7th and 17th birthdays shall attend a public day school during the time it is in session." However, "[a] child shall be excused from attending a public day school if he obtains equivalent instruction in a private school ... if the equivalent instruction is approved by the

---

6. The amended complaint alleges that "... plaintiff Churches employ teachers in their schools who, while proficient instructors ..., do not hold Maine State teaching certificates."

7. The amended complaint challenges the requirement of 20 M.R.S.A. § 1281.10 as to school size. But that subsection is applicable to public schools only.

8. At oral argument on the pending motion for summary judgment, counsel represented that plaintiffs do not challenge and will comply (or have complied) with the requirements relating to fire, safety, health, and sanitation. In so doing, however, plaintiffs concede no right on the part of the Department or the Commissioner to condition prior approval of their church-schools upon compliance with these standards.

commissioner." 20 M.R.S.A. § 911(3)(A). For purposes of exercising his statutory responsibility under this provision, the Commissioner is guided by: (1) the regulations of the State Board of Education,[9] issued pursuant to 20 M.R.S.A. § 51(3)(B), establishing requirements for approval of elementary and secondary schools; (2) the regulations of the Board, issued under 20 M.R.S.A. § 59, regarding certification of teachers; (3) the studies required to be taught, as prescribed in 20 M.R.S.A. § 102(7); (4) the rules issued by the Commissioner regarding such studies; (5) the requirements for approval of secondary schools, established by 20 M.R.S.A. § 1281; and (6) various provisions of title 22 M.R.S.A. and of the rules and regulations of the Department of Human Services, prescribing state health and sanitation standards applicable to schools, and of the Life Safety Code, containing fire safety standards issued by the Department of Public Safety pursuant to title 25 M.R.S.A.

The Department issues regulations, codified at 05–071 CMR 127, sections 1 and 2, prescribing the minimum instructional requirements for public schools and for private schools approved for attendance purposes under 20 M.R.S.A. § 911(3).

The qualification and procedural requirements for teacher certification are set forth in the regulations of the Department, codified at 05–071 CMR 115. The regulations governing school evaluation procedures and prescribing standards for obtaining school approval are codified at 05–071 CMR 125, as modified by an "Addendum" issued in September, 1981 which further explains the procedures for obtaining private sectarian school approval. These three sets of regulations are at the heart of plaintiffs' constitutional challenges and for that reason are summarized in the Appendix.

## II

## LAW

Defendants insist that there is no genuine issue as to any material fact respecting any of plaintiffs' claims for relief and that defendants are entitled to judgment as a matter of law. Plaintiffs have not moved for summary judgment on any of their claims for relief or on either of defendants' counterclaims. Defendants assert that their supporting affidavits have not been met by the plaintiffs with opposing affidavits setting forth specific facts raising any genuine issue for trial. *See* Fed.R.Civ.P. 56(e). For their part, plaintiffs point out that the pending motion may not be used as a vehicle for turning an adversary proceeding into a trial by affidavit, *see Thyssen Plastik Anger KG v. Induplas, Inc.,* 576 F.2d 400, 402 (1st Cir.1978); *Redman v. Warrener,* 516 F.2d 766, 768 (1st Cir.1975), and that the parties are entitled to try the material facts in genuine dispute, *see Associated Press v. United States,* 326 U.S. 1, 6, 65 S.Ct. 1416, 1418, 89 L.Ed. 2013 (1945).

Defendants must satisfy the Court that there are no material facts in dispute, *see Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Ramsay v. Cooper,* 553 F.2d 237, 240 n. 8 (1st Cir.1977), and that defendants are entitled to judgment as a matter of law in light of all undisputed facts and any reasonable inferences which may be drawn from those facts, viewed in the light most favorable to the plaintiffs, *see Adickes v. S.H. Kress & Co.,* 398 U.S. at 157, 90 S.Ct. at 1608; *Creative Environments, Inc. v. Estabrook,* 680 F.2d 822, 829 (1st Cir.1982). Summary judgment must be denied where there remains the *slightest doubt* as to any material fact. *United States v. Del Monte De Puerto Rico, Inc.,* 586 F.2d 870, 872 (1st Cir. 1978); *Peckham v. Ronrico Corp.,* 171 F.2d 653, 657 (1st Cir. 1948). There are numerous material facts in genuine dispute and, with but few exceptions, it is far from clear that defendants are entitled to judgment as a matter of law in light of the undisputed facts.

---

**9.** The State Board of Education is organized within the Department of Education and Cultural Services. 20 M.R.S.A. § 1–A.

A. *Free Exercise—Parental Rights—Right to Receive and Express Ideas—Counts I, IV and V*

Counts I, IV and V present interrelated constitutional claims. Count I alleges that the compulsory education laws impose prior restraints upon plaintiffs' federal and state constitutional rights to the free exercise of their religion and deny the parent-plaintiffs' Ninth Amendment rights to determine the religious education of their children. It is alleged that enforcement of the compulsory education laws and regulations would deprive the church-plaintiffs "of their liberty to freely carry out their religious mission in the form of Christian education" and "chill, if not destroy," the evangelical ministry of the pastor-plaintiffs "in the religious mission of the schools in their charge." The school principal- and teacher-plaintiffs assert that they would "be denied entirely the right to carry out a calling to the religious ministry of educating young Christians." Plaintiffs contend that no compelling state interest justifies the burden placed on their religious freedoms and that if any such interest exists it can be achieved through less restrictive means.

Count IV alleges that these state-imposed requirements would deprive plaintiffs of their parental rights and their property and enterprise rights under the First, Ninth and Fourteenth Amendments, and under Article 1, sections 1 and 6–A of the Constitution of the State of Maine.

Count V claims deprivations of plaintiffs' rights "in education to express, transmit or receive ideas," as guaranteed by the First, Ninth and Fourteenth Amendments, and by Article 1, sections 3 and 4 of the Constitution of the State of Maine.

1. *Exemption From Government Regulation.*

In 1878 the United States Supreme Court upheld the polygamy conviction of a Morman, declaring that *religious belief* alone, not *religiously-motivated conduct,* is protected by the First Amendment and that polygamy laws serve an important secular purpose by preserving monogamous marriage and preventing the exploitation of women. *See Reynolds v. United States,* 98 U.S. 145, 164, 25 L.Ed. 244 (1878). More recently, the Court accorded broadened constitutional protection to certain religiously-motivated conduct on the part of religious groups. *See Murdock v. Pennsylvania,* 319 U.S. 105, 109, 63 S.Ct. 870, 873, 87 L.Ed. 1292 (1943) [first amendment right in spreading beliefs, by distributing pamphlets without a license, outweighs legitimate secular purpose in generating revenue from persons using public streets]; *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) [first amendment right to solicit contributions and play religious recordings in public streets cannot be conditioned upon licensing determination by state as to whether a cause is religious, since state interest in preventing fraud and preserving peace can be achieved by less drastic means]. In *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), the Court took a significant step beyond earlier case law,[10] by holding that only a compelling state interest could justify burdening the free exercise of religion and that the state must bear the burden of demonstrating the unavailability of less restrictive means of achieving its aims. *Id.* at 403, 407, 83 S.Ct. at 1793, 1795.[11] In *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), after a careful consideration of the religious and state interests involved, the Court concluded that Amish

**10.** *See* L. Tribe, *American Constitutional Law* § 14–10, at 851 (1978); Note, *Religious Exemptions Under the Free Exercise Clause: A Model of Competing Authorities,* 90 Yale L.J. 350, 354 (1980); Pheffer, *The Supremacy of Free Exercise,* 61 Geo.L.J. 1115, 1139 (1973).

**11.** *Sherbert v. Verner, supra,* involved a Seventh-Day Adventist who was fired by her employer for refusing to work on her Sabbath and

was denied unemployment compensation. The Supreme Court held that the denial of unemployment compensation placed a burden on the exercise of plaintiff's religion, disproportionate to any state interest in avoiding "fraudulent claims of unscrupulous claimants feigning religious objections to Saturday work." 374 U.S. at 407, 83 S.Ct. at 1795.

parents need not comply with compulsory education laws requiring their children to attend school beyond the eighth grade. In *Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), the Court stated:

> The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest. However, it is still true that "[t]he essence of all that has been said and written on the subject is that only those interests of the highest order ... can overbalance legitimate claims to the free exercise of religion."

*Id.* at 718, 101 S.Ct. at 1432, *quoting Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972). *See also United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982) [state may limit religious liberty on sufficient showing that regulation is essential to overriding governmental interest].

The test presently applied in determining whether regulation of religiously-motivated conduct violates the free exercise clause contemplates a three-part determination:

1. whether the challenge is motivated by, and rooted in, a legitimate and sincerely-held religious belief;

2. whether and to what extent state regulation burdens free exercise rights; *and*

3. whether any such burden is justified by a sufficiently compelling state interest. *Wisconsin v. Yoder,* 406 U.S. at 215, 92 S.Ct. at 1533. Governmental regulation which significantly burdens the free exercise of religion cannot withstand constitutional challenge unless it represents the "least restrictive means of achieving some compelling state interest." *Thomas v. Review Board of Indiana Employment Security Division,* 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981). But exemption

of religious activity from regulation is not constitutionally required where it would "unduly interfere with fulfillment of the [compelling] governmental interest." *United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982).

For purposes of the pending motion, the defendants concede that plaintiffs' constitutional claims are motivated by, and rooted in, legitimate and sincerely-held religious beliefs, contending instead that plaintiffs' religiously-motivated activities are but minimally burdened by the compulsory education laws. Defendants argue that the Commissioner possesses the requisite administrative power and willingness to accommodate plaintiffs' religious beliefs and that the Court should determine, as a matter of law, that Maine's scheme of compulsory education is reasonable and that it serves compelling state interests warranting whatever minimal burdens may be imposed on plaintiffs' religious activities.

The important interests competing for judicial protection in the context of constitutional challenges brought under the free exercise clause are rarely susceptible to the requisite balancing on motion for summary judgment. *See Minkus v. Metropolitan Sanitary Dist.,* 600 F.2d 80, 84 (7th Cir. 1979) [challenge to state refusal to conduct civil service testing on date other than Sabbath raised substantial factual issues as to whether accommodation could be made by the state without undue hardship, requiring reversal of summary judgment in favor of defendant]. *See also Attorney General v. Bailey,* 386 Mass. 367, 436 N.E.2d 139, 150 (1982); 10 Wright & Miller, *Federal Practice and Procedure* § 2732, at 614 n. 67 (1973). Courts normally permit the parties to present a complete factual record to facilitate the requisite balancing of competing interests in considering first amendment claims. *See Developmental Disabilities Advocacy Center Inc. v. Tuttle,* 689 F.2d 281 at 288–289 (1st Cir. 1982).[12]

12. In *Kennedy v. Meacham,* 540 F.2d 1057, 1061 (10th Cir.1976), the Sixth Circuit decided that the dismissal of a complaint brought by prison inmates alleging unconstitutional restrictions on the free exercise of their satanic religion was improper, since the state neither established that no religion was involved nor that any burdens on its free exercise were war-

■ Although it is late in our constitutional history to mount a successful free exercise claim to exemption from all governmental regulation, *see United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); *Thomas v. Review Board of Indiana Employment Security,* 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Gillette v. United States,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940); *Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1878), and it seems clear that at least some state regulation may be imposed upon private schools attended by students of compulsory school age, *see Board of Education v. Allen,* 392 U.S. 236, 245–47, 88 S.Ct. 1923, 1927–1928, 20 L.Ed.2d 1060 (1968); *Everson v. Board of Education,* 330 U.S. 1, 18, 67 S.Ct. 504, 512, 91 L.Ed. 711 (1947); *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 631, 63 S.Ct. 1178, 1181, 87 L.Ed. 1628 (1943); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), these plaintiffs are entitled to present evidence at trial that Maine's compulsory education laws and regulations burden their religiously-motivated activities. The defendants bear the burden of proving that any governmental regulation which does burden the free exercise of plaintiffs' religion repre-

sents the least restrictive means of achieving some compelling state interest.

### 2. The "Faith Baptist" Case.

■ In support of their motion for summary judgment, defendants place great reliance on the dismissal by the United States Supreme Court of the appeal in *State ex rel. Douglas v. Faith Baptist Church,* 207 Neb. 802, 301 N.W.2d 571 (1981), *appeal dismissed sub nom. Faith Baptist Church v. Douglas,* 454 U.S. 803, 102 S.Ct. 75, 70 L.Ed.2d 72 (1981). In *Faith Baptist* the Nebraska Supreme Court, on *de novo* consideration, upheld a judgment enjoining the operation of elementary and secondary Christian schools for failure to comply with school approval requirements similar to those involved here. The *Faith Baptist* defendants, a church and certain of its officers and employees, claimed that enforcement of the Nebraska school approval requirements would violate their right to the free exercise of their religion and to bear, raise, and educate their children.[13] There the Christian schools utilized a Bible-oriented curriculum supplied by Accelerated Christian Education, consisting of a series of booklets containing instructional information and self-test questions considered appropriate for each instructional level. The curriculum permitted students to work at their own speed, under the supervision of teachers who administer tests and assist students having difficulty. The defendants refused to furnish reports of the names and addresses of students enrolled in their school as required by statute. The defend-

---

ranted by a compelling state interest in the regulation of prison affairs.

We do not say that a hearing is required in every instance. A well-developed showing by affidavits, exhibits, regulations and the responses to them might demonstrate, without factual dispute, such limited actions by defendants and such a justification for them as to obviate the need for an evidentiary hearing. In such a case the defendants would, of course, have to carry the heavy burden of justifying a summary judgment. See *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993 [994], 8 L.Ed.2d 176; *Webb v. Allstate Life Insurance Co.,* 536 F.2d 336, 340 (10th Cir.); *Mustang Fuel Corp. v.*

*Youngstown Sheet & Tube Co.,* 516 F.2d 33, 36 (10th Cir.).
*Id.* at 1061 n. 3. *See also Hoggro v. Pontesso,* 456 F.2d 917 (10th Cir.1972) [dismissal of inmate complaint alleging interference with free exercise of religion, held improper absent showing that state interest in prison discipline outweighed free exercise rights].

**13.** The constitutional rights of others may be asserted by one whose compliance with a legal duty would deny others their constitutional rights. *See Craig v. Boren,* 429 U.S. 190, 195, 97 S.Ct. 451, 455, 50 L.Ed.2d 397 (1976); *Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977).

ants refused to seek state approval of their curriculum, despite assurances of approval, and refused to employ only state accredited teachers and to seek approval to operate their schools. The defendants maintained that the operation of their schools was an extension of their church ministry and that the state had no authority to approve or accredit their schools, asserting that the basic philosophy of the public education system ran contrary to their belief in biblical Christianity and that the state was therefore "not capable of judging the philosophy of the defendants' school," *id.* 301 N.W.2d at 574. Finally, the defendants in *Faith Baptist* refused to submit to school inspection as required by Nebraska law "because the State has no right to inspect God's property."

Nebraska law provides penal sanctions for "violations of the various statutory provisions relating to compulsory education and operation of private, denominational and parochial schools." *Id.* 301 N.W.2d at 575. The Nebraska Supreme Court held that injunctive relief, as opposed to criminal prosecution, was appropriate to prevent a continuing and flagrant course of violations of Nebraska criminal law. *Id.*

The defendants in the present action claim that the summary dismissal of the *Faith Baptist* appeal is dispositive of plaintiffs' First and Ninth Amendment claims, since the Nebraska Supreme Court had rejected essentially these same claims. On the weight of the summary affirmance by the United States Supreme Court, these defendants seek summary judgment under Counts I, IV and V. *See* Defendants' Supplementary Memorandum, dated April 7, 1982, at 29.

"It is ... often difficult to understand the proper reach of Supreme Court summary affirmances and dismissals for want of a substantial federal question...." *Preston v. Seay,* 684 F.2d 172, 173 (1st Cir. 1982) (*per curiam*). The summary disposition of an appeal results in a judgment on the merits even though there has been no briefing, oral argument or written opinion. However, "[b]ecause a summary affirmance

is an affirmance of the judgment only, the rationale of the affirmance may not be gleaned solely from the opinion below." *Mandel v. Bradley,* 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977) (*per curiam*). *See also Tully v. Griffin, Inc.,* 429 U.S. 68, 74, 97 S.Ct. 219, 223, 50 L.Ed.2d 227 (1976). A summary disposition has precedential value in cases virtually indistinguishable from the case summarily disposed of, *see Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), and in cases involving but slightly different facts and issues from those in the case summarily disposed of, *see Rose v. Locke,* 423 U.S. 48, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975) (*per curiam*). "Summary actions, however, ... should not be understood as breaking new ground, but as applying principles established by prior decisions to the particular facts involved." *Mandel v. Bradley,* 432 U.S. at 176, 97 S.Ct. at 2240. Mr. Justice Brennan, concurring in *Mandel v. Bradley,* announced two clear standards by which courts should determine the precedential significance of a summary disposition:

> After today, judges of the state and federal systems are on notice that, before deciding a case on the authority of a summary disposition by this Court in another case, they must (a) examine the jurisdictional statement in the earlier case to be certain that the constitutional questions presented were the same and, if they were, (b) determine that the judgment in fact rests upon decision of those questions and not even arguably upon some alternative nonconstitutional ground. The judgment should not be interpreted as deciding the constitutional questions unless no other construction of the disposition is possible.

*Id.* at 180, 97 S.Ct. at 2242 (Brennan, J., concurring). *See also* Comment, *The Precedential Weight of Summary Dispositions of Appeals,* 29 Me.L.Rev. 325, 353 n. 104 (1978).

The issues before the Supreme Court in the *Faith Baptist* case were:

(1) Do Nebraska educational statutes and rules promulgated thereunder per-

taining to state approval of church schools and teacher certification deprive appellants, on their face and as applied, of free exercise of religion in violation of [the] First Amendment?

(2) Do Nebraska educational statutes and rules promulgated thereunder pertaining to state approval of church schools and teacher certification violate, on their face and as applied, individual appellants' fundamental rights to bear, raise and educate their children as guaranteed by [the] Ninth and Fourteenth Amendments?

*See* 49 U.S.L.W. 3940 (June 16, 1981), Subject Matter Summary of Cases Recently Filed.

■ Although it is far from clear that the constitutional questions with which the United States Supreme Court was presented in the *Faith Baptist* appeal are the same as those in the present action,[14] even assuming that to be the case it is doubtful that the summary affirmance rested upon a decision of either of the broad constitutional questions there posed. It simply cannot be determined that the judgment of the United States Supreme Court "rests upon decision of those questions and not even arguably upon some alternative nonconstitutional ground." *Mandel v. Bradley*, 432 U.S. at 180, 97 S.Ct. at 2242 (Brennan, J., concurring). The defendants in *Faith Baptist* re-

fused even to provide the state with the names and addresses of students enrolled in their schools. The Nebraska court enjoined the operation of the school "because there had been *no* compliance with the school laws of the State of Nebraska." *State v. Faith Baptist Church*, 301 N.W.2d at 573. (Emphasis added.) The United States Supreme Court was not of necessity required to rule on the broad constitutional issues there presented in order to reach its judgment and it has not in any event been made to appear that the Court accepted the reasoning of the Nebraska court.

### B. *Excessive Entanglement (Count II)*

■ Count II of the complaint asserts that the *imposition* of the Maine compulsory education laws and regulations would violate the Establishment Clause by: (1) imposing state-chosen values on religious entities; (2) involving the state in purely religious matters; and (3) fostering an excessive governmental entanglement with religion.

The mode of analysis for Establishment Clause questions is defined by the three-part test that a statute must have a secular legislative purpose, must have a principal or primary effect that neither advances nor inhibits religion, and must not foster an excessive governmental entan-

---

**14.** A simple comparison of the Maine and Nebraska regulatory schemes demonstrates that the constitutional questions raised in *Faith Baptist* cannot with certainty be considered the same as the constitutional issues here presented.

The Nebraska regulations prescribed a required curriculum, necessary materials and equipment, the length of the school day and year, health and safety requirements, the filing of a "Fall Approval Report" and an "Annual Term Summary Report," and the requirement that all professional staff members hold a valid Nebraska certificate or permit which, "[g]enerally speaking," meant that teachers must hold a baccalaureate degree. *See State v. Faith Baptist Church*, 301 N.W.2d at 573, 575. Nebraska law also required inspection and approval of schools before operation. *See id.* at 574. The Nebraska curriculum requirements were "very minimal in nature," *id.* at 579, and the state did not prescribe a course of study, *id.* at 580.

The Maine statutes and regulations require, *inter alia,* submission to the state of: (1) a statement of school educational philosophy, goals, and objectives and a plan for their implementation; (2) a description of grading methods and procedures; (3) a statement of the school's financial position and policies; and (4) a statement of the school's tuition refund policy. Schools are required to maintain a pupil-teacher ratio not exceeding 30 to 1 and a physical environment "acceptable to the Department of Educational and Cultural Services." Private schools must provide parents with a statement of Maine's school-entrance age requirements. The Maine regulations contain elaborate curriculum requirements and permit withdrawal of approval of a course of study "for cause." Teacher certification regulations in Maine require a baccalaureate degree, with two years of liberal education, appropriate subject matter concentration, professional knowledge, and supervised teaching experience. *See* 05–071 CMR Ch. 115, Introduction.

glement with religion. See *Roemer v. Maryland Public Works Bd.,* 426 U.S. 736, 748 [96 S.Ct. 2337, 2345, 49 L.Ed.2d 179] (1976); *Committee for Public Education v. Nyquist,* 413 U.S. 756, 772–73 [93 S.Ct. 2955, 2965–2966, 37 L.Ed.2d 948] (1973); *Lemon v. Kurtzman,* 403 U.S. 602, 612, 613 [91 S.Ct. 2105, 2111, 29 L.Ed.2d 745] (1971).

*Wolman v. Walter,* 433 U.S. 229, 235–36, 97 S.Ct. 2593, 2598–2599, 53 L.Ed.2d 714 (1977). Plaintiffs do not argue that the compulsory education laws and regulations have no secular legislative purpose or that their *primary effect* either advances or inhibits religion, but that those laws and regulations "foster an excessive governmental entanglement with religion." *Id.*

Defendants demand summary judgment under Count II on the grounds that the Commissioner is prepared to accept the requested information in any form plaintiffs wish to submit it, and even to arrange school visitations by the Department should plaintiffs desire, thereby obviating, defendants believe, any possibility of excessive entanglement.

An unconstitutional entanglement generally involves "the government's continuing monitoring or potential for regulating the religious activity under scrutiny." *United States v. Freedom Church,* 613 F.2d 316, 320 (1st Cir.1979). "[I]n determining whether there is excessive entanglement, the question is 'whether particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so.'" *Id. quoting Walz v. Tax Commissioner,* 397 U.S. 664, 669, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970).

The decision by the First Circuit in *Surinach v. Pesquera de Busquets,* 604 F.2d 73 (1st Cir.1979), outlines the appropriate judicial approach to the present entanglement challenge. *Surinach* found free-exercise and establishment clause violations where the Puerto Rico Consumer Affairs Department, pursuant to legislative directive, subpoenaed church-school records relating to operating costs, financial sources, school services, supplies and equipment, personnel salaries, scholarships, and related matters. The First Circuit began its analysis by rejecting the distinction drawn by the district court between the *gathering* of the information and the regulatory purpose (restraint of inflationary trends) for which information was sought. Observing that the gathering of information from the schools was not an end in itself, but rather a first step in a process which might lead to the imposition of ceilings on educational costs at the religious schools, Chief Judge Coffin said that the schools were not obliged to show, as a condition to relief, that the precise scenario of price regulation would in fact unfold. *Id.* at 75.

To the contrary, in the sensitive area of First Amendment religious freedoms, the burden is upon the state to show that implementation of a regulatory scheme will *not* ultimately infringe upon and entangle it in the affairs of a religion to an extent which the Constitution will not countenance. In cases of this nature, a court will often be called upon to act in a predictive posture; it may not step aside and await a course of events which promises to raise serious constitutional problems. In *Catholic Bishop of Chicago v. NLRB,* 559 F.2d 1112 (7th Cir.1977), *aff'd on statutory grounds,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), the court of appeals held that the exercise of jurisdiction by the NLRB over schools operated by the Roman Catholic Church violated the separation between church and state. Reasoning from the cases which have found various forms of aid to sectarian schools to be unconstitutional, it expressly rejected the Board's contention that any constitutional problems should be litigated 'down the line' if and when disputes arose between the Board and schools subject to its jurisdiction:

> The whole tenor of the Religion Clauses cases involving state aid to schools is that there does not have to be an actual trial run to determine whether the aid can be segregated, received and retained as to secular activities only, but it is sufficient to strike the aid down that a reasonable likelihood or possibility of entanglement exists.

**1222**

559 F.2d at 1126.

*Surinach v. Pesquera de Busquets,* 604 F.2d 73, 75–76 (1st Cir.1979).

The court in *Surinach* found that the effect of the governmental demand for information "constitutes a palpable threat of state interference with the internal policies and beliefs of [the] church related schools." *Id.* at 77. The court expressed concern that the information could eventually be used to "interfere seriously" with the church canons requiring church-schools to maintain academic excellence, *id.,* and that, if it were administratively determined that church-school costs were to be contained, the schools would likely have to cut back on their curricula and facilities, thus affecting their religious objective of offering the highest quality education possible, *id.* Moreover, the court feared that the regulatory process might require a determination as to which school costs were necessary and reasonable, giving rise to a possible conflict between religious and secular values. *Id.* at 77–78 (*e.g.,* state could determine student-teacher ratio in religious schools unusually low).

The First Circuit took little comfort from the fact that the Commonwealth had not yet made determinations in conflict with religious doctrine or yet concluded that cost controls were necessary. *Id.* at 78. The court observed that these first steps on the road to regulation could chill the recruitment, allocation and expenditure of funds, *id.,* and that the regulatory scheme authorized continuing governmental involvement in church affairs which could "intrude upon decisions of religious authorities as to how much money should be expended and how funds should best be allotted to serve the religious goals of the schools," *id.* at 79.

*Surinach* held that the Commonwealth had not met its burden of showing a compelling state interest justifying the imposition of its regulations on the religious schools, nor its burden of showing that its secular interests could not be served by less intrusive means. *Id.* at 79–80. The court cogently observed that the Commonwealth had not even argued that it "would be unable to fulfill its wide ranging duties if any portion of one segment of the economy were to be excluded from its investigation and subsequent regulation," *id.* at 80.

The defendants contend that the imposition of the challenged regulations would place no burden on plaintiffs' religious practices. On the contrary, the burdens clearly appear, though their extent remains subject to proof at trial. For example, the defendants admit that their schools are not operating in compliance with the requirement of Maine law that only certified teachers be employed, *see* 20 M.R.S.A. § 1281 (Supp. 1981), which constitutes cause to close schools pursuant to Board regulation, *see* 05–071 CMR 125, at 4. Other regulatory requirements under challenge may give rise to excessive governmental entanglements with religion; for example, the informational requirements pertaining to school finances, tuition policies, and educational philosophy; and departmental inspection and approval of the physical facilities and environment of church-schools.

Once it is recognized that the regulatory scheme imposes *some* burden on plaintiffs' religious practices, it is clear that defendants have yet to meet their burden of showing that no excessive entanglement would result from the imposition of the scheme upon plaintiffs. It is no answer that plaintiffs should be required to submit the requested information (in whatever form) and await litigation "down the line" if and when specific disputes arise. *See Surinach v. Pesquera de Busquets,* 604 F.2d at 75–76; *see also Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979); *Steffel v. Thompson,* 415 U.S. 452, 458–59, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974); *O'Shea v. Littleton,* 414 U.S. 488, 493–99, 94 S.Ct. 669, 674–677, 38 L.Ed.2d 674 (1974). The defendants must show that the regulatory scheme to be imposed on plaintiffs represents the least restrictive means of achieving some compelling state interest and that the information required of plaintiffs would serve a specific and sufficiently compelling state interest to warrant burdening their

religious practices. *See Surinach v. Pesquera de Busquets,* 604 F.2d at 79–80. These are matters of proof.

The Commissioner asserts on affidavit that certain of the information required by the form of application for initial approval, *see* Exhibit 7, attached to Affidavit of Commissioner Raynolds, October 19, 1981, need not be provided by the plaintiff-schools and that it is the policy of the Department to waive, on request, any regulatory requirement "to accommodate . . . religious . . . schools," provided "the basic requirements of the compulsory education laws deemed necessary for the benefit and protection of the children of this state will not be unduly compromised." The Commissioner avers that the requirement that the school physical environment be "acceptable to the Department," *see* 05–071 CMR, at 5, has not been and will not be imposed. The Commissioner further proposes relaxation of the teacher certification requirement, stating that church-school teachers need not obtain certification "if this is against their religious convictions," but need only "demonstrate qualification for certification." *See* Second Supplemental Affidavit of Commissioner Raynolds, at 11. With respect to the request for information regarding school financial position and policies, the Commissioner asserts that church-schools need only identify their religious affiliation, *id.* at 13, and that church-schools need not provide information regarding school tuition policies. Finally, the Commissioner states that private schools ineligible for public tuition funds, which neither wish to obtain five-year approval status nor seek indirect public aid, through textbook loans, medical services, remedial service or standardized testing, need not provide, with their initial application, information regarding their educational philosophy, goals and objectives.

The present action appears to have been precipitated by letters of the Commissioner, dated October 9, 1981, informing certain of these plaintiff-schools that they may not provide education to children of compulsory school age during hours of the day when such children would otherwise be attending public schools, absent approval by the Commissioner, and further advising that approval must be obtained in accordance with the rules adopted by the Department, copies of which had been previously provided.[15] The Commissioner further stated, "I ask you once again to submit the necessary information by completing the school approval application, by submitting the required information in some other format or by making arrangements for a visit by representatives of the Department." Finally, the Commissioner advised that legal action would be commenced against the schools after October 20, 1981, should the schools fail to comply.

The Commissioner did not expressly state that only those portions of the application form which deal with the five topics specified in the letter need be completed in order to qualify a school for approval. Previously the schools had been provided with copies of the rules governing approval and with copies of the application form. The October 9 letter again requested "the information necessary for [departmental] review and approval" pursuant to the application previously provided and the application form enclosed.[16] The addendum to the general

---

**15.** The letter states that the *minimum* information required for approval is evidence that the school:

1. has been inspected by the Department of Human Services for compliance with state health and sanitation standards;
2. has been inspected by the Fire Marshal for compliance with the Life Safety Code;
3. offers a course of study meeting the minimum curriculum requirements;
4. has an instructional staff which is either certified or qualified for certification; and

5. maintains and safeguards adequate attendance, health and academic records.
The Commissioner directed that such information be supplied pursuant to the application form enclosed with the October 9, 1981 letter. The Commissioner offered to accommodate any concerns about completing the application and to expedite reviews by making Department representatives available to visit the schools, observe operations, and inspect records "as an alternative to the completion of the forms."

**16.** The Attorney General of the State of Maine advised plaintiffs' counsel on October 8, 1981,

rules, which prescribes procedural exceptions for private school approval, does not indicate that private sectarian schools need only submit information concerning the five areas identified in the Commissioner's letter.[17] Furthermore, the letter does not propose to obviate departmental review as a condition of approval, but describes the "minimum information" required for approval as consisting of certain "evidence." The Court does not consider that it has been made to appear on the present record that mere compliance with the demand for such "evidence," regardless of its probativeness, would result in school approval.

"A defendant cannot ordinarily moot a plaintiff's claim by voluntarily ceasing allegedly unlawful conduct." L. Tribe, *American Constitutional Law* § 3–14 at 66. *See DeFunis v. Odegaard,* 416 U.S. 312, 318, 94 S.Ct. 1704, 1706, 40 L.Ed.2d 164 (1974); *Sanchez-Mariani v. Ellingwood,* 691 F.2d 592 at 595–596 (1st Cir. 1982). The affidavits of the Commissioner, however well intentioned, do not moot plaintiffs' claims. In order to moot plaintiffs' claims in these respects, at least defendants must establish

that they will not again seek the information sought at the time of the institution of the suit. *See United States v. Phosphate Export Association,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968).

Defendants are not entitled to summary judgment under Count II.

### C. *Due Process (Count III)*

█ Count III alleges that the compulsory education laws "are impermissibly vague and overbroad and delegate legislative authority to administrative personnel wholly without statutory standards," in violation of the due process clause. Plaintiffs further claim that many of the regulations of the Department are *ultra vires* and that enforcement of the compulsory education laws would deprive plaintiffs of the use of the "educational enterprise to which they have devoted money and contributed personal services to help create and maintain."

### 1. *Vagueness/Overbreadth.*[18]

In a facial challenge to the overbreadth and vagueness of a law, a court's first

---

in response to their request for an interpretation of the school approval laws, that their concerns could "be answered by the enclosed materials: the school-approval regulations (with explanatory addendum for sectarian schools), the new minimum curriculum rule, and the application for school approval." *See* Exhibit E attached to Plaintiffs' Supplemental Memorandum, filed March 24, 1982.

**17.** A copy of the addendum is to be attached when copies of the general rules (05–071 CMR 125) are supplied to private sectarian schools. *See* Supplemental Affidavit of Commissioner Raynolds, filed April 8, 1982.

The addendum prescribes exemptions from: (1) the certification requirement, for teachers of religion and ministers who are headmasters; (2) the requirement of vision and hearing tests; (3) the minimum instructional time requirement for kindergarten; and (4) the maximum daily teaching schedule requirement. The addendum does not exempt sectarian schools from employing teachers who can "demonstrate qualifications for certification;" the requirement of information as to school financial position and policies, tuition policies, educational philosophy, goals and objectives; or from the requirement that the school physical environment must be "acceptable to the Department."

The application form itself does not exempt sectarian schools from these requirements, but purports to relax the requirement that information be provided as to school financial policies, by permitting sectarian schools merely to identify the religious affiliate from which it derives financial support.

**18.** While related, these two doctrines derive from somewhat different policies and look to different effects. Overbreadth analysis looks to whether a law 'sweeps within its ambit [protected] activities' as well as unprotected ones, *Thornhill v. Alabama,* 310 U.S. 88, 97, 60 S.Ct. 736, 741, 84 L.Ed. 1093 (1940), while a vagueness inquiry focuses on whether a law states its proscriptions in terms sufficiently indefinite that persons of reasonable intelligence 'must necessarily guess at its meaning'. *Broadrick v. Oklahoma,* 413 U.S. 601, 607, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1973), *quoting Connally v. General Const. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). *See Grayned v. City of Rockford,* 408 U.S. 104, 108–114, 92 S.Ct. 2294, 2298–2302, 33 L.Ed.2d 222 (1972); *Landry v. Daley,* 280 F.Supp. 938, 951–52 (N.D. Ill.1968) (three-judge court). *Fantasy Book Shop, Inc. v. City of Boston,* 652 F.2d 1115, 1122 n. 9 (1st Cir., 1981).

task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail. The court should then examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications.

*Village of Hoffman Estates v. Flipside,* —— U.S. ——, —— – —— n. 6, 102 S.Ct. 1186, 1191 n. 6, 71 L.Ed.2d 362 (1982). Once it is made to appear that the statutory challenge implicates constitutionally protected conduct, the Court will require a greater degree of statutory specificity than in nonconstitutional contexts. —— U.S. at ——, 102 S.Ct. at 1193.

   a. *Overbreadth.*

   ▮ "The Supreme Court has emphasized that overbreadth facial challenges to the constitutionality of a state law should prevail only in rare circumstances." *New England Accessories Trade v. City of Nashua,* 679 F.2d 1, 4 (1st Cir.1982). "[T]he overbreadth doctrine is 'strong medicine' and [courts] have employed it with hesitation and then 'only as a last resort.'" *New York v. Ferber,* —— U.S. ——, ——, 102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113 (1982). The doctrine is predicated on the belief that persons whose conduct is constitutionally protected may refrain from exercising their rights for fear that to do so would constitute a violation of law, thus insulating the statute from constitutional challenge. *See New York v. Ferber,* —— U.S. at ——, 102 S.Ct. at 3359–3361, *citing Village of Schaumberg v. Citizens for a Better Environment,* 444 U.S. 620, 634, 100 S.Ct. 826, 834, 63 L.Ed.2d 73 (1980). But before a statute may be invalidated on its face for overbreadth, even one which arguably touches such traditional forms of free expression as books and films, the overbreadth must be "substantial," that is, susceptible to

"a substantial number of impermissible applications ...," *id.* —— U.S. at ——, 102 S.Ct. at 3362.

   ▮ It is conceivable that some of these regulations may inhibit the free exercise of constitutional rights, but the Court is not persuaded that the regulations reach "a substantial amount of constitutionally protected conduct," *see Village of Hoffman Estates v. Flipside,* 102 S.Ct. at 1191, n. 6, or that this is one of those rare occasions when the plaintiffs are entitled to mount an overbreadth challenge on the ground that the Maine compulsory education laws and regulations could be unconstitutionally applied to others. *See New York v. Ferber,* —— U.S. at —— – ——, 102 S.Ct. at 3359–3361 ["arguably impermissible applications" of statute forbidding distribution of material depicting a sexual performance by child, outweighed by its legitimate reach]. The arguably impermissible applications of the challenged compulsory education laws are relatively insignificant. Any actual overbreadth may "be cured through case-by-case analysis of the fact situations to which [the law's] sanctions, assertedly, may not be applied," *Broadrick v. Oklahoma,* 413 U.S. 601, 615–16, 93 S.Ct. 2908, 2917–2918, 37 L.Ed.2d 830 (1973). *See also New England Accessories Trade v. City of Nashua,* 679 F.2d at 5.

   Summary judgment must be granted for the defendants on plaintiffs' claim of unconstitutional overbreadth.

   b. *Vagueness.*

   ▮ A challenge predicated on unconstitutional vagueness implicates dual principles of due process, requiring: (1) fair notice of the line between lawful and unlawful conduct; and (2) sufficiently explicit legislative limitations on the discretion of law enforcement officials to avoid arbitrary and discriminatory enforcement. *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222 (1972);[19] *Papachristou v. City of Jackson-*

---

**19.** In *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–2299, 33

L.Ed.2d 222 (1972), the Supreme Court articu-

*ville,* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972); *United States v. Professional Air Traffic Controllers,* 678 F.2d 1, 3 (1st Cir.1982). A statute may neither forbid nor require the doing of an act in terms so vague that persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926); *see also Zwickler v. Koota,* 389 U.S. 241, 249, 88 S.Ct. 391, 396, 19 L.Ed.2d 444 (1967). A statute is unconstitutionally vague *on its face* if it is expressed in such general terms that "no standard of conduct is specified at all." *Brache v. County of Westchester,* 658 F.2d 47, 50–51 (2d Cir. 1981), *quoting Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971). A facial vagueness challenge can only succeed when the statute "cannot validly be applied to any conduct." *Id.* at 50.

> [W]hile legislatures "ordinarily may delegate power under broad standards ..., [the] area of permissible indefiniteness narrows ... when the regulation ... potentially affects fundamental rights," like those protected by the first amendment. And where a law authorizes a system of prior licensing, the Supreme Court has consistently required the statutory delegation to provide "narrowly drawn, reasonable and definite standards for the [administering] officials to follow...."

L. Tribe, *American Constitutional Law* § 12:35 at 732–33 (1978) (footnotes omitted). In *Fantasy Book Shop, Inc. v. City of Boston,* 652 F.2d 1115, 1123–24 (1st Cir. 1981), the First Circuit upheld three sections of a public amusement licensing stat-

ute which permitted denial of a license whenever issuance would (1) unreasonably increase pedestrian traffic; (2) increase the incidence of disruptive conduct; or (3) unreasonably increase the level of noise. These standards, while not identifying the dispositive levels of noise, traffic, or disruption, "describe[d] a behavioral effect of at least potential objective specificity," and apprised applicants of factors which would determine the licensing decision, *id.* at 1123. Nevertheless, the court found invalid on its face a city ordinance authorizing the denial of a license where the operation of the public amusement would "significantly harm[] the legitimate protectible interests of ... affected citizens of the city," *id.* The "public interest" standard was deemed defective because it "comprise[d] purely subjective evaluations of wholly unrestricted factors, and thus vest[ed] the denial of a license in the essentially unbridled discretion of a municipal administrator," *id.* at 1123, thereby imposing an unconstitutional standard "where a license is necessary for the exercise of [constitutionally] protected activity," *id.* at 1124. *See also City of Biddeford v. Biddeford Teachers Association,* Me., 304 A.2d 387, 400 (1973) [statutory standards must guide agency in following legislative policy and prevent administrative arbitrariness].

■ Plaintiffs challenge the requirement of 20 M.R.S.A. § 911.3 that students not attending public schools receive "equivalent instruction," by asking whether "equivalent" means measure-for-measure instructional equality; whether instructional equivalence is to be determined by reference to local public schools or to public schools in general; and whether overall instructional equivalence is to be determined

---

lated the constitutional bases of the vagueness doctrine:

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act

accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

(Footnotes omitted.)

by according due weight to any respect in which private school instruction is found to be superior to public school instruction.

Section 911.3(A) excuses children between the ages of 7 and 17 from the requirement that they attend a public day school, if the child "obtains equivalent instruction in a private school or in any other manner arranged for by the school committee or the board of directors and if the equivalent instruction is approved by the commissioner." Section 911.3(B) provides:

> If any request to be excused is denied by a local school committee or board of directors, an appeal may be filed with the commissioner. The commissioner shall review the request to be excused to determine whether the local school committee or board of directors has been correct in its finding that no equivalent instruction is available. If the commissioner finds that equivalent instruction is available to the child, he shall approve the request to be excused.

20 M.R.S.A. § 911.3(B). Section 911.3 contemplates that exemption from the requirement of public school attendance is to be sought first through the local school committee or board of directors, which is to determine whether the proffered private instruction is equivalent to the public school instruction "available to the child." The local board determination is subject to review by the Commissioner.[20] Unless excused from public school attendance, a child may be considered an habitual truant after an absence of ten full days. 20 M.R.S.A. § 914.

A person having control of an habitual truant and primary responsibility for the truancy is subject to a civil forfeiture of $200. 20 M.R.S.A. § 911.8.

Although the Maine compulsory education scheme carries civil rather than *criminal* sanctions, clearly defined statutory standards are still required. *Flipside v. Village of Hoffman Estates,* 639 F.2d 373, 377–78 (7th Cir. 1981) [licensing laws and laws

imposing civil sanctions must also provide minimum level of clarity]. But the term "equivalent," as used in section 911.3, is not so vague that persons of common intelligence would necessarily have to "guess at its meaning and differ as to its application." *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). The term is not of such generality that "no standard of conduct is specified at all." *See Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971). The term "equivalent instruction" is capable of objective measurement, *cf. Fantasy Book Shop, Inc. v. City of Boston,* 652 F.2d at 1123, and has "a core meaning that can reasonably be understood," *cf. Brache v. County of Westchester,* 658 F.2d at 51.

Although federal courts have no "power to construe and narrow state laws" in resolving a vagueness challenge, *Grayned v. City of Rockford,* 408 U.S. at 110, 92 S.Ct. at 2299, it appears highly likely that "equivalent instruction" would be interpreted as requiring private school instruction equal to that mandated by Maine law for public schools generally. *Knox v. O'Brien,* 7 N.J. Super. 608, 72 A.2d 389, 391 (1950) ["equal in worth or value, force, power, effect, import and the like"], *quoting In re Bonsall's Estate,* 288 Pa. 39, 135 A. 724, 725 (Sup.Ct. 1927); *Stephens v. Bongart,* 15 N.J.Misc. 80, 189 A. 131, 134 (1937) [instruction equal in value and effect to that given in a public school].

In *Scoma v. Chicago Board of Education,* 391 F.Supp. 452, 462–63 (N.D.Ill.1974), the court rejected a facial vagueness challenge to a statute exempting from compulsory public school attendance any child attending a private school teaching "the branches of education taught to children of corresponding age and grade in the public schools." The court held that the statutory reference to public schools "should cause no difficulty for citizens who desire to obey the statute." *Id.* at 463. *See also Webster's*

---

**20.** Although local authorities may exempt a child from the public-school attendance requirement, the Commissioner must also determine that the private school instruction is "equivalent." *See* 20 M.R.S.A. §§ 911.1(A), 911.3(A) & 914.

*Third New International Dictionary* (1976), at 769.

Whatever vagueness may inhere in the term "equivalent" appears "reasonably necessary to embrace all of its legitimately intended objectives without creating an encyclopedic and unwieldy" statute. *Fantasy Book Shop, Inc. v. City of Boston,* 652 F.2d at 1123. It must be presumed that Maine courts "will give [the term] a limiting construction that will preserve its facial constitutionality," *id., citing Erznoznik v. City of Jacksonville,* 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975). *See also* Me. Atty. Gen. Report 1963–64, at 160, 162 [correspondence course unapproved by district directors and Commissioner is not the equivalent of school attendance].

Defendants are entitled to summary judgment on plaintiffs' facial vagueness challenge to the term "equivalent".

■ The vagueness challenge to the statutory and regulatory provisions authorizing the Commissioner to prescribe courses of study and to withdraw school approval "for cause" is more meritorious. 20 M.R.S.A. § 102.7; 05–071 CMR 125, §§ 1(D)(3) & 2(b)(2). The *Commissioner* is authorized to "prescribe the course of study" and to deny approval to schools which do not offer a course of study prescribed by the Commissioner. 20 M.R.S.A. § 102.7. Private schools founded after September 3, 1965 must furnish the Commissioner with a copy of their course of study. 20 M.R.S.A. § 102.7. Approval may be denied secondary schools unless their graduation requirements include American history, four years of English "and other courses approved by the Commissioner." *See* 05–071 CMR 125, at 3. Other provisions of law notwithstanding, the statute itself authorizes the Commissioner to withdraw approval "for cause." 20 M.R.S.A. § 102.7. Neither the compulsory education statutes nor the regulations define "cause," except that it is provided by Board regulation that "cause" includes, "but is not limited to, the failure . . . to provide the minimum course of study . . . and the failure . . . to file a course of study, or notice of changes in the

course of study or related reports as required by the Commissioner." 05–071 CMR 127, at 10. *See Historic Green Springs, Inc. v. Bergland,* 497 F.Supp. 839, 854 (E.D.Va. 1980) [due process requires administrators to structure and confine their discretionary powers by means of safeguards, standards, principles, and rules]. A school which is denied approval may request a board of review, appointed in part by the Commissioner, but the recommendations of the board of review are subject to the final approval of the Commissioner. "If the school fails to comply [with requirements] and does not take necessary remedial action, the commissioner may remove basic approval." 20 M.R.S.A. § 102.7.

Even private organizations which accredit educational institutions have been required to maintain reasonable standards and to apply them with an even hand. *See Marjorie Webster Jr. College v. Middle States Ass'n of Colleges & Secondary Schools, Inc.,* 432 F.2d 650, 655–659 (D.C. Cir.1970), *cert. denied,* 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970); *Rockland Institute v. Ass'n of Independent Colleges,* 412 F.Supp. 1015, 1018 (C.D.Calif.1976); *Parsons College v. North Central Ass'n of Colleges & Secondary Schools,* 271 F.Supp. 65, 73 (N.D.Ill.1967).

Since 20 M.R.S.A. § 102.7 has the potential of affecting the first amendment rights of these plaintiffs and the school approval statute and regulations establish a state licensing scheme, the vagueness doctrine demands narrowly drawn, definite and reasonable standards for the guidance of the administering officials.

Accordingly, defendants' motion for summary judgment must be denied.

### 2. *Ultra Vires Regulations.*

■ "Where a statute specifically delegates to an administrative agency the power to make rules, courts recognize a presumption that such rules, when duly noticed, are valid." *United States v. Boyd,* 491 F.2d 1163, 1167 (9th Cir.1973). *See E.I. duPont de Nemours & Co. v. Collins,* 432

U.S. 46, 53–55, 97 S.Ct. 2229, 2233–2234, 53 L.Ed.2d 100 (1977); *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973); *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 379–81, 89 S.Ct. 1794, 1800–1801, 23 L.Ed.2d 371 (1969); *Ciampa v. Schweiker,* 511 F.Supp. 670, 677 (D.Mass.1981). The presumption is rebuttable on "a showing that the challenged regulation is an unreasonable exercise of the delegated power— *i.e.* inconsistent with the statute." *Id. See Commissioner v. Acker,* 361 U.S. 87, 90–92, 80 S.Ct. 144, 146–147, 4 L.Ed.2d 127 (1959); *United States v. Calamaro,* 354 U.S. 351, 358–59, 77 S.Ct. 1138, 1143, 1 L.Ed.2d 1394 (1957). Courts "must reject administrative constructions of [a] statute, whether reached by adjudication or by rule-making, that are inconsistent with the statutory mandate or that frustrate . . . [legislative] policy. . . ." *F.E.C. v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981). *See Mohasco Corp. v. Silver,* 447 U.S. 807, 825, 100 S.Ct. 2486, 2496, 65 L.Ed.2d 532 (1980); *United States v. Larionoff,* 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Theriault v. Brennan,* 488 F.Supp. 286, 299 (D.Me.1980), *aff'd.* 641 F.2d 28 (1st Cir.1981).

■ The challenged regulations governing school evaluation and approval, codified at 05–071 CMR 125,[21] were adopted pursuant to 20 M.R.S.A. § 51 "to assure that Maine school children [receive] protection against unsafe facilities, inadequate curriculum and unprepared teachers." 05–071 CMR 125, at 9. The Board is empowered and directed to "establish requirements for approval and accreditation of elementary and secondary schools" and to "establish standards for certification of teachers and other professional personnel." 20 M.R.S.A. § 51(3)(B) (as amended by 1981 Me.Laws c. 464, § 2). The Board is required to fulfill its administrative responsibilities in accordance with 20 M.R.S.A. § 21, which mandates the promulgation of administrative rules and regulations pursuant to the Maine Administrative Procedures Act, 5 M.R.S.A. § 8051, *et seq.* The Commissioner is authorized to "prescribe the studies to be taught . . . in private schools approved for attendance . . . purposes . . . and the course of study prescribed by the commissioner shall be followed in . . . all private schools approved by the said Commissioner." 20 M.R.S.A. § 102.7. *See also* 20 M.R.S.A. § 1286.

Most of the challenged administrative regulations cannot be considered *ultra vires.* The unrebutted affidavit of the Commissioner asserts that the Department requires this information in order to assess "whether the minimum curricula are being taught in the context of a course of study reasonably

21. Plaintiffs' *ultra vires* challenges fall into four categories. *See* Exhibits A & B, attached to Plaintiffs' Supplemental Memorandum, filed March 24, 1982.

(1) Plaintiffs challenge various regulations requiring the submission of a statement of educational philosophy, goals and objectives; a plan for accomplishing the same; a description of the methods and procedures to be utilized in measuring attainment; and information from which it may be ascertained that the course of study and pupil needs are consistent with the stated purpose of the school. *See* 05–071 CMR 125, at 1–2.

(2) Plaintiffs challenge, for lack of a statutory basis, the regulation requiring a statement of the school's financial position, financial policies and other financial information. *See* 05–071 CMR 125, at 2.

(3) Plaintiffs challenge, as *ultra vires,* the regulation requiring that *all* teachers hold a valid teaching certificate and that all schools maintain a pupil-teacher ratio of not more than 30:1, noting that though the statute requires that high schools employ only certified teachers and have a student-teacher ratio of not more than 30:1, *see* 20 M.R.S.A. § 1281(4), there is no such statutory requirement for elementary schools.

(4) Plaintiffs challenge the statutory basis for the regulation that private schools not operate with compulsory school age children in attendance without first obtaining written approval from the Department, *see* 05–071 CMR 125, at 3; 05–071 CMR 127, at 10, pointing out that the compulsory attendance statute penalizes *parents* for enrolling children in schools not approved for attendance purposes but does not *forbid the operation* of unapproved private schools.

adequate for educational purposes" and that "[t]he adequacy of the total educational program is determined by assessing whether it is a planned and sequential program and whether it may reasonably be anticipated to accomplish the school's own stated educational goals." Second Supplemental Affidavit of Commissioner Raynolds, Jr., at 9. The affidavit further states that the adequacy of a course of study cannot be evaluated in a vacuum and that all of the requested information is relevant for that purpose. *Id.* The administrative power to require the information flows from the duty to establish school approval standards, imposed upon the Commissioner by the Legislature. The promulgation of administrative regulations requiring information as to the educational philosophy, goals, and course of study of applicant schools represents a reasonable exercise of the power delegated to the Board by 20 M.R.S.A. § 51.

The regulations requiring that applicant schools state their financial position and policies and their tuition refund policies enable the gathering of information "sought because of its relevance to school-municipal relations, where a private school receives public tuition payments" and, in addition, "as a general indicator of the school's economic stability." Second Supplemental Affidavit of Commissioner Raynolds, at 13. These regulations are consistent with the legislative mandate and represent a reasonable exercise by the Board in furtherance of its administrative duty to establish school approval standards.[22]

The Board is authorized by statute, 20 M.R.S.A. § 51.3(B), to promulgate the same elementary-school approval standards as to teacher certification and pupil-teacher ratio as are imposed upon secondary schools by statute, *see* 20 M.R.S.A. § 1281. The fact that the approval standards for secondary

schools are prescribed by statute does not preclude the Board from adopting like administrative requirements for the approval of elementary schools. The certification requirement and the 30:1 pupil-teacher ratio are consistent with and tend to effectuate the legislative goals of compulsory education by assuring that all Maine children receive adequate instruction.

The defendants are entitled to summary judgment on each of plaintiffs' *ultra vires* challenges, except that relating to the regulatory prohibition against the operation of unapproved schools.

■ The Commissioner asserts by affidavit that the regulatory requirement of school approval prior to the commencement of operations represents an "administrative interpretation and implementation of the approval requirement stated in 20 M.R.S.A. § 911.3 and the truancy prohibition of 20 M.R.S.A. § 911," Second Supplemental Affidavit of Commissioner Raynolds, at 3, and that it furthers the compulsory education scheme by assuring that private school students will obtain sufficient instruction from the outset of their attendance and that their education will not be interrupted in the event that a departmental review undertaken after the commencement of school operations should necessitate denial of approval, *id.* The requirement that an application for initial approval be filed nine months in advance of the opening of the school is said to be necessary to afford the Department and health and safety officials sufficient time to review school facilities and proposed programs, and to discuss and correct perceived deficiencies prior to student attendance. *Id.*

The promulgation of the regulations requiring prior written approval may have exceeded the power delegated to the Board

---

**22.** Plaintiffs' challenge to these regulations, which appear not to be enforced against church-schools, *see* Initial Application Form, question I(8); Renewal Application, question II(7); Exhibits 1 & 2, attached to Affidavit of Commissioner Raynolds, filed October 19, 1981, may in any case not be ripe for adjudication. *See Abbott Laboratories v. Gardner,* 387

U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967) [ripeness doctrine prevents judicial interference until administrative decision formalized and its effects are felt in a concrete way]. *See also* K. Davis, *Administrative Law Treatise,* § 21.00 (1982 Supp.) [controversies are not ripe unless hardship due to lack of decision is substantial].

by the Legislature. These regulations prescribe administrative sanctions for the enforcement of the compulsory education laws which differ materially from the enforcement sanctions selected by the Legislature.

The Maine Legislature has mandated that a child who is absent from school, without excuse, for the equivalent of 10 full days or for one-half day on seven consecutive school days within any 6-month period is "an habitual truant." 20 M.R.S.A. § 914. Any person who has control of an habitual truant and bears primary responsibility for the truancy is guilty of "a civil violation for which a forfeiture of not more than $200 shall be adjudged." 20 M.R.S.A. § 911.8. "Any person who induces a child to absent himself from school, or harbors or conceals such child when he is absent commits a civil violation for which a forfeiture of not less than $500 shall be adjudged." *Id.*

Local school authorities are responsible for the implementation of the truancy laws and are directed, under the guidance of the Commissioner, to "promulgate reasonable rules and regulations," 20 M.R.S.A. § 911.5, for local enforcement of the truancy laws. *See* 20 M.R.S.A. § 911.6–A. If unable to resolve an habitual truancy the local school superintendent must refer the matter to the local school committee or board of directors, 20 M.R.S.A. § 911.6–A(A), which must hear the matter, after providing the parents or guardian at least seven days' written notice of the hearing, its purpose, the necessity of their and their child's presence, and their right to inspect their child's records and the principal's report. 20 M.R.S.A. § 911.6–A(C) & (D). Information presented to the committee or board "shall include, but not be limited to, the report presented by the principal to the superintendent of schools." 20 M.R.S.A. § 911.6–A(B). "After considering the facts presented and after discussing the matter with the child and his parents or guardian," the committee or board

shall determine by a majority vote to:

.     .     .     .     .

A. Instruct the child to attend school as required by statute and inform the par-

ents or the guardian of their legal responsibilities to assure the child's attendance; *or*

B. Waive the compulsory school attendance law provided the child is at least 14 years old;

(1) The parents or guardian may appeal this decision to the commissioner, who shall appoint a fair hearing officer to hear the appeal;

(2) The fair hearing officer shall make a report to the commissioner on the testimony presented at the hearing and shall make a recommendation to the commissioner as to the disposition of the appeal; and

(3) The commissioner shall review the report and recommendation of the fair hearing officer and shall affirm, modify or reverse the decision of the local school committee or board of directors.

20 M.R.S.A. § 911.7. Compulsory school age students not attending approved schools are considered truants and their parents and others who induce truancy are subject to civil forfeitures.

The Commissioner states, by way of affidavit, that he has discouraged local officials from undertaking truancy enforcement actions because parents may be sending their children to unapproved schools "in the good faith belief [that their children] ... are receiving the benefits and protections of the state's compulsory education laws." Second Supplementary Affidavit of Commissioner Raynolds, at 4. The Commissioner represents that truancy actions conducted on a broad scale would be "unduly burdensome" and expensive for local school officials, the Department, and the courts, *id.* at 5, and would neither prevent the operation of unapproved schools nor satisfy "[t]he Department's duty to review and approve schools, according to a systematic administrative process and general standards." *Id.*

*These regulations may have transformed the scheme selected by the Legislature for the enforcement of the compulsory education laws, i.e., the truancy laws, into an unauthorized administrative system for the*

*licensing of private schools.* It has not been made to appear that the Maine Legislature has either mandated or authorized the administrative closing of unapproved private schools operating with compulsory school age children in attendance. On the present record it would appear that the Legislature has opted in favor of implementing its scheme of compulsory education by requiring the initiation, at the local level, of the statutory procedures and sanctions prescribed for truancy.

A regulation "fundamentally at odds with the manifest [legislative] design" cannot be sustained "simply because it is not 'technically inconsistent' with the statutory language." *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, ——, 102 S.Ct. 821, 827, 70 L.Ed.2d 792 (1982). *See Pacific Gas & Elec. Co. v. United States,* 664 F.2d 1133, 1136 (9th Cir. 1981) [I.R.S. regulation held erroneous and invalid]. Considering the stringent legislative restrictions which must be placed on administrative agencies and officials delegated the power to grant or deny licenses, *see Kunz v. New York,* 340 U.S. 290, 294, 71 S.Ct. 312, 315, 95 L.Ed. 280 (1951); *Cantwell v. Connecticut,* 310 U.S. 296, 307, 60 S.Ct. 900, 904, 84 L.Ed. 1213 (1940), the argument that administrative convenience warrants the licensing and closing of private schools provides an insufficient basis for summary judgment on this constitutional claim.

### III

### SUMMARY

Partial summary judgment in favor of defendants shall enter on: (1) the overbreadth challenge; (2) the facial vagueness challenge to the regulatory requirement of "equivalent instruction"; (3) the *ultra vires* challenge to the regulatory requirement of information concerning school philosophy and financial information; and (4) the *ultra vires* challenge to the regulatory requirement of teacher certification and pupil-teacher ratio in elementary schools.

In all other respects the motion for summary judgment must be denied.

SO ORDERED.

### APPENDIX

#### A. *Approval Procedures*

Chapter 125, section 1 of the regulations of the Board of Education sets out the procedures and standards required to establish and maintain an elementary or secondary school. *See* School Evaluation Procedures, 05–071 CMR 125, attached as Exhibit C to Defendants' Supplementary Memorandum in Support of Motion for Summary Judgment. These rules were modified in September, 1981 in regard to private schools seeking basic approval. *See* "Addendum: Nonpublic Schools Approved for Attendance Purposes Only," attached as Exhibit 7 to the Supplemental Affidavit of Harold Raynolds, Jr.

#### 1. *Initial Approval.*

The regulations, as modified, prescribe the following procedures for securing *initial* school approval:

a. Application forms, obtained from the Department of Educational and Cultural Services, must be submitted to the Department at least nine months before the planned opening day of school, unless the advance filing requirement is waived or modified on request.

b. The application must include:

i. a statement of school educational philosophy, goals and objectives and a plan for the accomplishment of those goals and objectives;

ii. a plan indicating the method and procedures to be used in measuring and evaluating the degree of attainment of educational goals, and a plan for recording and reporting pupil progress;

iii. a detailed description of school programs of instruction, including specific attention to the course of study and the language of instruction;

iv. a description of the amounts and varieties of instructional equipment and supplies available for pupil use; and

v. the names of individuals or groups responsible for school policy and the

name and address of the administrative head of the proposed school.

c. The applicant must submit the following additional information to the Department three months prior to the projected opening of school:

i. a copy of any certificate of incorporation;

ii. a statement of financial position and policies;

iii. a statement of the tuition refund policy;

iv. a list of the names, addresses and social security numbers of the certified teachers to be employed; and

v. evidence that all adult employees are "tubercular free."

d. The applicant must request facility inspection by the State Fire Marshal's office and by the Sanitary Engineering Division of the State Department of Human Services at least three months prior to opening. The sanitation inspection must extend to all food preparation facilities and demonstrate a clean and healthful environment. A licensed plumbing inspector may provide the requisite approval of school facilities in relation to the State Plumbing Code.

e. After notice of facility approval regarding sanitation and fire safety, the applicant must request inspection of its facilities, curriculum and staff by the Department and supply all information necessary to determine whether it has met Department standards, after which it is entitled to a prompt decision by the Commissioner. A school may not operate until it obtains written approval from the Department.

f. Secondary school approval requires a showing that the school has "a graded or sequential educational program of at least two years length ... available to each student", and a statement of the graduation requirements, including American history, four years of English and "other courses approved by the Commissioner."

g. Within 30 days of the receipt of notice that the Department intends to withhold approval, the school may "request a board of review." The board of review, consisting of one person appointed by the Commissioner, one by the school, and a third chosen by the other two, makes a recommendation to the Commissioner, whose decision "shall be final."

2. *Maintaining Approval.*

The regulations in subsection B, section 1, chapter 125 establish standards for *maintaining* school approval, including requirements that:

a. all teachers hold a valid Maine Teaching Certificate at the appropriate level, except teachers "of religion, theology, religious philosophy or similar courses in non-public schools" and ordained ministers functioning as headmaster or directors of sectarian schools;

b. pupil-teacher ratios not exceed 30 to 1 and that normal class size not exceed 30 pupils;

c. all children in grades K–12 be immunized against common childhood diseases, exemptions available on an individual basis by written parental request;

d. new staff prove that they are tubercular free;

e. the history, geography and natural and industrial resources of Maine be taught in at least one grade after 6th grade;

f. buildings be safe, hygienic, approved by the Department of Public Safety and by the Department of Human Services, and provide a physical environment acceptable to the Department;

g. new school construction meet the standards of the Division of School Facilities in accordance with existing statutes and with Board procedures;

h. the school year consist of at least 180 days, no more than 5 days to be devoted to in-service teacher education;

i. the total instructional time in a school week (normally Monday through Friday) equal at least 25 hours and not less than 3 hours in any one day;

j. the school safely maintain a daily register of student attendance and other student records, and record student accom-

plishment at least quarterly, forwarding such records upon student transfers; and

k. schools complete and submit to the Department "reports deemed necessary by the Commissioner."

The regulations further require that schools, once approved, must notify the Department of "any substantive changes in [their] program of studies, facilities, certified teaching staff, number of pupils, [or] administration." Private schools must file a roster, containing the name and residence of each pupil in attendance, with the public school superintendent of the school administrative unit within which the pupil resides, and must provide notification upon the withdrawal of any pupil from the private school. Private schools are required to "provide assurance" that the record of each pupil will be transferred to the appropriate public school superintendent in the event that the private school is closed. Finally, private schools are required to provide the parents of their pupils "a statement indicating the school entrance age requirements for entering public schools of the State of Maine."

Subsections C and D of chapter 125, section 1, prescribe the time periods for which approval may be granted. Newly established schools may not operate without the prior written approval of the Commissioner.[1] Annual approval is required for each of the first five years of operation. During the fifth year of operation, unless the school otherwise requests, a "self-evaluation study" must be conducted by the school, addressing its present needs and long-term goals, "using the instrument (sic) and procedures designed by the Department...." Within three months after the completion of its study, the school must file with the Department a five-year plan regarding its facilities, curriculum and staff development. A school which has been continuously approved by the Commissioner for five

years and completes the "futures planning process" receives a five-year approval certificate. A school which opts to omit the self-evaluation study and five-year plan must submit an annual report to the Department[2] and its certificate of approval must be renewed annually.

Secondary schools which participate in an accreditation program under the direction of the New England Association of Schools and Colleges (NEASC) need not conduct self-evaluation studies, but "must file a report indicating short- and long-range goals directing attention to facilities, curriculum and staff development." See 05–071 CMR 125, at 8. If such a school obtains NEASC accreditation, it will be granted approval by the Commissioner for a period commensurate with its accreditation. See 05–071, CMR 127, at 10.

Notwithstanding any other section of law, the Commissioner may remove basic approval from any school for cause. Whenever a school fails to meet requirements, the Commissioner shall give due notice and shall hold a hearing. If the school fails to comply and does not take necessary remedial action, the Commissioner may remove basic approval.

The Commissioner may waive any approval requirement, provided a written request is made by the school documenting the existence of extenuating circumstances warranting waiver in the interests of the state and of the pupils.

B. *Course Requirements*

In addition to the requirements of chapter 125 of the Board regulations, schools seeking state approval for purposes of the compulsory education laws must comply with the requirements of chapter 127, relating to the "course of study." The instructional requirements for the basic approval of nonpublic schools, codified at section

1. The information required for initial approval is normally provided on an eight-page questionnaire-application form issued by the Department. *See* Exhibit 1, attached to the Affidavit of Commissioner Raynolds, filed October 19, 1981.

2. The annual report is a seven-page questionnaire. *See* Exhibit 2, attached to Affidavit of Commissioner Raynolds, filed October 19, 1981.

2(A), 05–071 CMR 127, direct that the school:

1. teach in English (with certain exceptions);

2. instruct all students (grades one through eight) in reading, grammar, spelling, composition, and communications skills; [3]

3. provide four years of high school English, including instruction in grammar, spelling, composition, literature, and communications skills;

4. provide mathematics instruction in grades one through eight, including instruction in mathematical concepts, the metric system, computation skills, measurement skills, and problem-solving skills; [4]

5. provide at least one year of high school mathematics;

6. provide at least one year of instruction in American history and civil government, for grades one through nine, including the U.S. Constitution, the Declaration of Independence, voting and citizenship;

7. require students in grades seven through twelve to take at least one year of instruction in history, geography, and the natural and industrial resources of Maine;

8. require science instruction in grades one through eight and at least one year of science instruction in high school;

9. provide physical education to all students in grades one through twelve, in a program "appropriately adapted to the physical facilities available to the school;" and

10. provide at least one-half hour of instruction weekly "in correlation with appropriate components of the school curriculum[,] in the great principles of humanity as intended by 20 M.R.S.A. § 1221."

Elementary schools are required by chapter 127 to provide a planned, sequential program for the elementary grades, including the basic course requirements described above. Secondary schools must provide instructional programs for at least two grade levels, including the basic course of study described above, and prescribe additional requirements for graduation. Graduation requires a minimum of 16 units of instruction, based on the Carnegie unit or an equivalent measure. Graduation requirements must "be published and made known to all students upon entry into high school." Schools must report to the Commissioner, in their annual reports or by other timely means, all changes in their courses of study, including their graduation requirements.

Section 2(B) of chapter 127 directs that "[n]o nonpublic school shall operate for purposes of the compulsory education law without the prior review and approval of the Commissioner . . . of its course of study." A certificate of basic school approval signifies that the school offers "equivalent instruction" for purposes of 20 M.R.S.A. § 911(3). "Basic approval of a school's course of study may be removed by the Commissioner for cause," including, "but not limited to, the failure to provide the minimum course of study required by law and regulation, and the failure . . . to file . . . a course of study, or [to provide] notice of changes in the course of study or related reports as required by the Commissioner."

Where it is believed that school officials have failed to provide the course of study requirements specified by this rule and applicable statutes, or school officials fail to provide information sufficient to demonstrate compliance with course of study requirements, the Commissioner shall give due notice of probable removal of basic approval and schedule a hearing on the matter pursuant to the requirements of the Administrative Procedure Act. The hearing may also consider allegations that the school has failed to comply with (1) any other requirement of basic school approval, as defined by the

---

**3.** The addendum to the rules governing the approval of private schools states that the English and mathematics course requirements apply in grades one through *six*.

**4.** *See* note 3 *supra*.

State Board of Education in Chapter 125, or (2) specific statutory requirements. 05–071 CMR 127, at 11.

### C. Teacher Certification Requirements

The teacher certification requirements contemplate "a bachelor's degree with two years of liberal education, appropriate subject matter concentration, professional knowledge and supervised teaching experience." See 05–071 CMR 115, Introduction.

An elementary school teacher must either have graduated "from a four-year baccalaureate program approved for the education of elementary teachers, together with the formal recommendation of the preparing institution" or (1) a bachelor's degree from an accredited institution; (2) at least 50% of all undergraduate study in liberal education courses; and (3) "thirty hours of approved general professional education courses," at least six of which must provide teaching experience.[5] Teacher certification must be renewed every five years; "six hours of approved study" is a prerequisite to renewal.

A secondary school teacher can obtain certification either by graduating from a four-year baccalaureate program approved for the education of secondary school teachers and by obtaining the formal recommendation of the preparing institution, or by making a satisfactory showing that he or she has: (1) a bachelor's degree from an accredited institution; (2) devoted at least one-half of all undergraduate studies to courses in liberal education; and (3) an established teaching field [6] and at least 18 hours of approved general professional teaching courses. Secondary school teachers must also complete six hours of approved study every five years to obtain renewal of their certification.

5. Teachers who complete a graduate program in elementary education and are recommended by their preparing institution need not meet the third requirement.

6. An "established teaching field" requires either a 30-credit hour major and an 18-credit

hour minor in any subject commonly taught in secondary schools, or at least 50 credit hours in one area of specialization, such as social studies, science, physical science and mathematics.